**Steven Brian ALVARADO, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 71779.**

Court of Criminal Appeals of Texas, En Banc.

Nov. 15, 1995.

John D. Gates, El Paso, for appellant.

John L. Davis, Kathleen M. Anderson, Assistant Dist. Attys., El Paso, and Robert A. Huttash, State's Atty., Austin, for the State.

## OPINION

MANSFIELD, Judge.

An El Paso County jury found appellant, Steven Brian Alvarado, guilty of two counts of capital murder, to wit: the September 22, 1991, murders of Refugio Carmen Sustaita and her adult son, Manuel Sustaita.[1] At the punishment stage of appellant's trial, the jury answered affirmatively, as to each count, the special issues submitted to it under Article 37.071, § 2(b),[2] and it answered negatively, as to each count, the special issue submitted to it under Article 37.071, § 2(e).[3] The

---

1. Appellant's trial occurred in September and October of 1993. Texas Penal Code § 19.03(a)(2), the statutory provision under which appellant was convicted, provides in relevant part that "[a] person commits [a capital] offense if he commits murder [i.e., intentionally or knowingly causes the death of an individual] and: the person intentionally commits the murder in the course of committing or attempting to commit ... robbery." The record reflects that appellant was seventeen years old at the time of the offense.

2. All references to articles are to those in the Texas Code of Criminal Procedure.

3. Article 37.071, § 2, provides in relevant part:

(b) On conclusion of the presentation of the evidence [at the punishment stage], the court shall submit the following issues to the jury:

(1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

trial court then sentenced appellant to death on each count. Direct appeal to this Court was automatic. See Article 37.071, § 2(h). We will affirm the judgments of the trial court.

Appellant argues fourteen points of error in his brief on appeal. We will address his evidentiary insufficiency points of error first and then address his remaining points in chronological order.

In point of error number seven, appellant contends that, with respect to his conviction for the murder of Carmen Sustaita, he has been denied his liberty without due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution, because the evidence adduced at his trial was insufficient "to connect [him] to the death of Carmen Sustaita, either as the primary actor or as a party." The State responds that "the evidence is sufficient to show appellant guilty as the primary actor in the murder of Manuel Sustaita, and [from his] killing [of] that victim, the one who could best defend the two victims, the jury could conclude that appellant was guilty as a party to the murder of Carmen Sustaita."

Count two of the indictment charged appellant with "intentionally caus[ing] the death of . . . Refugio Carmen Sustaita in the course of committing and attempting to commit the offense of robbery." The jury charge at the guilt/innocence stage of trial authorized the jury to find appellant guilty of the capital murder of Carmen Sustaita either alone or as a party.[4] The key prosecution evidence[5] at the guilt/innocence stage of trial was as follows:

Martha Reyna testified that she had been a neighbor of Carmen and Manuel Sustaita on Wilshire Street in El Paso. She testified further that on September 23, 1991, she received a telephone call from Blanca Sustaita, who had tried without success to contact Carmen. At Blanca's urging, Reyna walked to the Sustaita residence and knocked on the door. There was no answer, so Reyna peered through the windows of the residence to determine whether anyone was at home. She saw Carmen's motionless body through a bedroom window and telephoned the police.

El Paso Police Officer Ernest Wade testified that police officers found Carmen and Manuel Sustaita's bodies at 10301 Wilshire Street in El Paso on September 23, 1991. According to Wade, the residence "appeared as [though] it had been ransacked," and "three different sets of . . . bloody shoe prints" were seen leading away from the residence.

El Paso Police Officer Dale Fernandez testified that Manuel Sustaita's body was found

---

(c) The state must prove each issue submitted under Subsection (b) of this article beyond a reasonable doubt, and the jury shall return a special verdict of "yes" or "no" on each issue submitted under Subsection (b) of this article.

 \* \* \* \* \*

(e) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:

 \* \* \* \* \* \*

(4) shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

4. Texas Penal Code § 7.01 provides, in relevant part:

(a) A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

Section 7.02 provides, in relevant part:

(a) A person is criminally responsible for an offense committed by the conduct of another if:

 \* \* \* \* \* \*

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

5. Appellant presented no defensive evidence at the guilt/innocence stage.

just inside the entrance to the Sustaita residence. He also testified that a baggie of marihuana was found on Manuel Sustaita's person.

Blanca Sustaita testified that she was Carmen Sustaita's daughter and Manuel Sustaita's sister, and that she knew before their deaths that they were selling marihuana and cocaine out of their residence at 10301 Wilshire Street in El Paso.

Norma Nieto testified that she, too, was a daughter of Carmen Sustaita and a sister of Manuel Sustaita, and that she visited them at their residence on September 22, 1991. She testified further that she saw Manuel and appellant arguing at the Sustaita residence around 3:00 or 4:00 p.m. on that day.

Joshua Salcido testified that late on the evening of September 22, 1991, he went to David Cameron's residence in El Paso to visit Cameron. When Salcido arrived at the residence, he saw appellant, Cameron, and Augustin "Augie" Avila preparing to leave. They soon did leave, but Salcido remained behind to watch television. Appellant, Cameron, and Avila returned to the Cameron residence about 45 minutes later, covered with blood. They carried with them a small duffel bag containing three kitchen knives, a small quantity of marihuana and cocaine, and $80 in cash. The cocaine was divided among the four of them. While the cocaine was being divided, Avila, who was trembling, stated that he, Cameron, and appellant had "just took somebody out." Salcido then asked to whom Avila was referring, and Cameron, who was also trembling, responded that it had been "Manny and his mom." Appellant then said, "It felt fucking good." Salcido testified further that Cameron, Avila, and appellant placed their bloody clothes and knives into a white plastic trash bag, and that later that night, after a cousin of Salcido arrived at the Cameron residence, they all rode in a car to Transmountain Road, where they dumped the trash bag.

Chris Carillo testified that late on the evening of September 22, 1991, he drove his car to the Cameron residence in response to a telephone call from his cousin, Joshua Salcido. After Carillo arrived at the residence, appellant, Salcido, and Cameron got into Carillo's car and all four "cruised around" El Paso, eventually finding their way to Transmountain Road, where they threw a bag off the side of the road. Later that night, while the four were still driving around, either Cameron or appellant stated that they had "fucked some people up"—which Carillo interpreted to mean they had killed some people—because an unnamed woman had cheated them in a drug deal.

El Paso Police Detective Joe Laredo testified that a police search of the area adjacent to Transmountain Road in late September 1991 turned up a plastic bag, some clothing, a box of baggies, and two kitchen knives.

Betty Ann Cranford testified that she was David Cameron's mother and that on September 25, 1991, she noticed that two kitchen knives were missing from the Cameron residence. She testified further that the knives found by police off Transmountain Road were identical to the knives that were missing from her home.

El Paso Police Detective Alfonso Marquez testified that on September 24, 1991, he and several police officers arrested appellant at a residence in El Paso for the murders of the Sustaitas. The officers apprehended appellant as he was attempting to flee out the back door of the residence. Appellant had several open wounds on both of his hands.

El Paso Police Detective Antonio Leyba testified that appellant gave a statement, which was reduced to written form, after he was arrested. The statement (State's exhibit number 126)[6] read, in relevant part, as follows:

> ... I am 17 years of age. I am high school drop out. I last attended the 9th grade at Andress High School. At this time I am in the Crimes Against Persons office where I am under arrest for 2 counts of Capital Murder dealing with the murder of a friend of mine Manny whose last name I don't know and his mother who I also

6. Appellant's written statement shows on its face that, prior to making the statement, he received the warning required by Article 38.22, § 2, and

he knowingly, intelligently, and voluntarily waived the rights set out in the warning.

don't know her name. . . . I met Manny a short while ago I don't remember exactly when and I also don't remember when I found out that he dealt drugs.

*On Sunday night Sept. 22, 1991 David I don't know his last name and Auggie I don't know his last name either decided to go to Manny's house to pay him some money that I owed him from a previous drug deal. All 3 of us went to Manny's house to pay him the money and I was going to make another purchase.* I don't remember who knocked on the door. Manny answered the door and he let all 3 of us in. I then gave him the money for the previous deal. Manny then started to complain that the money wasn't the right amount. Manny told me This isn't the right amount of money. I then told him fuck you that is the amount that I always pay. I then gave him the money to the other purchase. Rather I gave him the money all at once. Manny then said I'm going to keep all of your money. I then told him no man fuck you just give me my money. Manny then said no I'm going to fuck you up. *Manny then pulled out a knife from the back of his waist. He then proceeded to come towards me with the weapon. I defended myself by using his own weapon against him. He cut his own throat. I then got the knife away from him and I started to stab him.* I don't remember how many times I stabbed him but I know that it was more than once. *I don't know what happened to the mother but I remember seeing her laying floor unconscious. All of us then started to look for the stuff. By stuff I mean anything worth of value that you can carry.* I didn't take anything because I didn't find anything. I looked for the stuff just here and there. All 3 of us left the house and walked to David's house. I know my way around but I don't pay attention to the streets.

When we got to David's house I then noticed that they had some stuff from Manny's house. I believe that Auggie was the one who had it. We then washed up and took our clothes off because they had blood on them. We then just kicked back. Later a friend of our who I don't know

what his name is came over and picked up our stuff which was our clothes that had the blood on them. He then took with the clothes and David and I stayed there. I believe that Auggie went home. We stayed there until the guy who took our clothes came back. Then we went with him in his car. We just went cruising, Auggie was no longer with us when we were in the car. We stayed all night in the car.

On yesterday Tuesday afternoon I called my girlfriend Joelynn and told her that we were in a bit of a jam and asked her if we could stay there with her since we didn't have a place to stay. She asked her mom then said that we could stay there. David and I then went to her house. I don't remember her address. We stayed there until the police arrived placed us under arrest. I would like to say that Angel (Joelynn) nor her mom knew what was going on. The police took me to the station ... and then I decided to give this account of what happened on Sunday night at Mannys house. *I want the record to show that I acted only in self defense.*

I want to say that even though this are not my exact words it is an accurate account of what ... happened on Sept. 22, 1991 at Manny's house.

/s/ Steve Alvarado

(Emphasis added; all errors in original.)

Finally, El Paso County Chief Medical Examiner Juan Contin testified that on September 24, 1991, he performed autopsies on the bodies of Carmen and Manuel Sustaita. He testified further that Carmen's body had sustained eighteen knife wounds, three of which had been fatal, and that Manuel's body had sustained 34 knife wounds, seventeen of which had been fatal. He also testified that Manuel was a "well-nourished, muscular male that ... weighed 174 pounds," and that Manuel's neck wounds could not have been self-inflicted.

██ Consistent with the Fourteenth Amendment guarantee of due process of law, no person may be convicted of a criminal offense and denied his liberty unless his criminal responsibility for the offense is

proved beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970). Our state statutory law has the same requirement. Tex.Penal Code § 2.01; Tex.Code Crim.Proc. art. 38.03. Because the jury is the sole judge of the weight and credibility of the evidence at a criminal trial, our task as an appellate court is to consider all the record evidence in the light most favorable to the jury's verdict, and to determine whether, based on that evidence and all reasonable inferences therefrom, any rational jury could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). If, given all the evidence, a rational jury would necessarily entertain a reasonable doubt as to the defendant's guilt, the due process guarantee requires that we reverse and order a judgment of acquittal. *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex.Crim.App. 1992), cert. denied, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). Appellate judges are not factfinders, however; we may not re-evaluate the weight and credibility of the record evidence. Rather, we act only "as a final, due process safeguard ensuring ... the rationality of the factfinder." *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App. 1988).

■ Based on the evidence at trial, a rational jury could have found beyond a reasonable doubt that: (1) on September 22, 1991, appellant, Cameron, and Avila armed themselves with kitchen knives and went to the Sustaita residence with the intent of killing the Sustaitas in retaliation for the Sustaitas' cheating in a drug deal; (2) appellant, Cameron, and Avila did in fact kill the Sustaitas that night in the Sustaita residence; (3) appellant himself intentionally and unjustifiably killed Manuel; and (4) appellant, if he did not directly cause the death of Carmen Sustaita, was nonetheless criminally responsible for her death as a party because his killing of Manuel Sustaita was done in part to prevent Manuel from defending her. Thus, a rational jury could have found that appellant committed an act (the killing of Manuel) with the intent to promote or assist the intentional killing of Carmen. See *Martinez v. State*, 763 S.W.2d 413, 420, n. 5 (Tex.Crim.App.

1988); *Webb v. State*, 760 S.W.2d 263, 268–269 (Tex.Crim.App.1988), cert. denied, 109 S.Ct. 3202 (1989); Tex.Penal Code § 7.02(a)(2). A rational jury, as the sole judge of the weight and credibility of the evidence, could have rejected appellant's assertion in his written statement that he acted only in self-defense. We overrule point of error number seven.

■ In point of error number eight, appellant argues again that he has been denied his liberty without due process of law. Under this point, appellant contends that the evidence presented at the guilt/innocence stage was insufficient to prove his guilt of capital murder under either count because "there [was] no evidence that [he] first formed the intent to rob, and then, in the course of that act, caused the death of another human being."

■ In order for a murder to qualify as capital murder under § 19.03(a)(2), the killer's intent to rob must be formed before or at the time of the murder. *Robertson v. State*, 871 S.W.2d 701, 705 (Tex.Crim.App. 1993), cert. denied, — U.S. ——, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994). Thus, "proof of a robbery committed as an afterthought and unrelated to a murder [will] not provide sufficient evidence of capital murder." *Moody v. State*, 827 S.W.2d 875, 892 (Tex.Crim.App.), cert. denied, 506 U.S. 839, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992). If there is evidence, however, from which the jury could rationally conclude beyond a reasonable doubt that the defendant formed the intent to obtain or maintain control of the victim's property either before or during the commission of the murder, then the State has proven that the murder occurred in the course of robbery. *Robertson v. State*, 871 S.W.2d at 705. The jury may infer the requisite intent from the conduct of the defendant. *Id.*

Based on the evidence at trial, a rational jury could have found beyond a reasonable doubt that: (1) the Sustaitas sold illegal drugs to appellant on more than one occasion; (2) appellant believed they had cheated him on at least one such occasion; (3) on the night of September 22, 1991, appellant, Cameron, and Avila armed themselves with

knives and went to the Sustaita residence with the intent to kill the Sustaitas in retaliation for the cheating; and (4) immediately after the killings, appellant, Cameron, and Avila, without discussion, searched the Sustaita residence for things to steal. From these findings, a rational jury could have further found beyond a reasonable doubt that, at or before the time of the killings, appellant formed the intent to obtain control of the Sustaitas' property. We overrule point of error number eight.

■ In point of error number fourteen, appellant contends the evidence was insufficient to support the jury's affirmative finding, as to each count, on the special issue concerning his future dangerousness. See footnote three, *supra*. At the punishment stage of trial, the key evidence relating to appellant's future dangerousness was as follows:

El Paso Police Officer Morris Williams testified that on May 30, 1990, he responded to a call regarding a domestic disturbance at appellant's residence in El Paso. When Williams arrived at the scene, appellant's mother, who was distraught and covered with ketchup, told him that appellant had thrown the ketchup on her and had told her, "This is what you are going to look like after I cut you up." Appellant's mother then told Williams that appellant was in his bedroom. As Williams approached appellant's bedroom, an arrow flew through the closed door of the bedroom and lodged in the opposite wall. Moments later, a second arrow penetrated the door, but it failed to pass completely through. Williams identified himself as a police officer through the closed door, but appellant threatened to kill anyone who approached. Williams eventually persuaded appellant to leave the bedroom. As appellant did so, Williams observed "daggers or swords" and a mace inside the bedroom. Williams also testified that appellant was "associated" with an El Paso street gang, that he had a reputation for carrying weapons, and that he had a bad reputation for being peaceable and law-abiding.

Connie Edgemon testified that she was a "psychological associate" at Big Spring State Hospital and that she examined appellant there in June 1990. Based on that examination and reports from her staff, she believed that appellant was "violent" and "dangerous," and that he had a "full-blown antisocial personality disorder." She also testified that appellant had "no concern for the rights of others," and that he admitted selling illegal weapons, abusing and selling illegal drugs, sexually assaulting a woman, mutilating human infants in satanic rituals, and committing numerous other crimes. Edgemon testified further that appellant was discharged after twelve days at Big Spring "because the consulting psychiatrist and the chief clinical psychologist ... felt he was a danger to the other patients in the hospital and that he was not suffering from a mental illness that was treatable and, therefore, under the mental health code, had to be discharged by law."

Richard Coons testified that he was a psychiatrist, that he had reviewed appellant's medical and criminal records, and that he believed, based on those records, that appellant had an antisocial personality disorder. Coons described the disorder as "a type of personality that ... does acts against society on a repeated basis and essentially doesn't have a conscience about it." Coons also testified that attempts at treating the disorder in other patients had produced "very sparse" results.

El Paso County Deputy Sheriff Eduardo Chavez testified that during a search of appellant's jail cell on November 21, 1992, he found three "shanks" hidden inside appellant's mattress. Chavez explained that a "shank" was an "instrument which has been sharpened for the purpose [of] caus[ing] serious bodily injury or death."

Charles Selman Jr. testified that on December 12, 1992, he was an employee of the El Paso County Sheriff's Office, and that on that date he participated in a search of appellant's jail cell. He testified further that the search turned up a fourth shank inside appellant's mattress.

Finally, defense witness William Follett testified that he, too, was a psychiatrist, that he examined appellant in the summer of 1993, and that he believed appellant had an antisocial personality disorder as well as par-

anoid schizophrenia. He testified further, however, that he believed there was a "good chance" that appellant's antisocial tendencies could be alleviated with medication and therapy.

■ The State had the burden of proving beyond a reasonable doubt that the answer to the punishment issue on future dangerousness was "yes." See footnote three, *supra*. Thus, the State had the burden of proving there was a probability that appellant, if allowed to live, would commit criminal acts of violence in the future, whether in or out of prison. *Narvaiz v. State,* 840 S.W.2d at 424. In its determination of the issue, the jury was entitled to accept or reject any or all the evidence at both the guilt/innocence and punishment stages of trial. *Valdez v. State,* 776 S.W.2d 162, 166–167 (Tex.Crim.App.1989), cert. denied, 495 U.S. 963, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990). As an appellate court, our task is to view all the evidence in the light most favorable to the jury's affirmative answer, and then determine whether, based on that evidence and all reasonable inferences therefrom, any rational jury could have found beyond a reasonable doubt that the answer to the punishment issue was "yes." *Harris v. State,* 738 S.W.2d 207, 225–226 (Tex.Crim.App.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987).

■ Utilizing the required standard of review, we must again reject appellant's insufficiency claim. Shocking circumstances of the offense itself (including the number of people killed), habitual use of illegal drugs, and prior unadjudicated acts of violence against people and property are all evidence of future dangerousness. *Narvaiz v. State,* 840 S.W.2d at 425; *Rosales v. State,* 841 S.W.2d 368, 382 (Tex.Crim.App.1992), cert. denied, —— U.S. ——, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993). In addition, a bad reputation for being peaceable and law-abiding, possession of weapons while incarcerated, and psychiatric testimony of a violent personality also constitute evidence of future dangerousness. *Stoker v. State,* 788 S.W.2d 1, 8 (Tex.Crim.App.1989), cert. denied, 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990); *Livingston v. State,* 739 S.W.2d 311, 340–341

(Tex.Crim.App.1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). Therefore, considering the record evidence as a whole, we conclude it was sufficient to support the jury's affirmative finding, as to each count, on the first special issue.

■ Under this point of error, appellant also argues that the evidence "was insufficient ... to impose the death penalty" because of negligence on the part of the State. Appellant argues:

> The State of Texas, the same governmental entity that now seeks to execute the appellant, failed in its original encounter with him [at Big Spring State Hospital] and, to remedy or justify or explain or simply hide away its failure, the State now seeks to dispose of the appellant—a horrific washing of its bureaucratic hands. Pseudo-experts like Ms. Edgemon were thoroughly dumbfounded and confused and even scared by the appellant, but rather than seek competent and more expert guidance and treatment, these caseworkers virtually shoved him out the door, placed him on an airplane to El Paso, and waited expectantly, hoping that he would kill, that he would butcher, that he would somehow land himself once again in the clutches of the State, but this time so they could kill him, not treat him.

We discern no reversible error. We have no basis for concluding that the State's conduct with respect to appellant was actually negligent, even assuming *arguendo* such negligence could render "insufficient" the evidence supporting the jury's findings on the special issues. We overrule point of error number 14.

■ In point of error number thirteen, appellant argues that the trial court erred in denying his challenges of veniremembers Magallanes, Driscoll, Reed, Puig, Bettin, and Sosa for cause under Article 35.16. Appellant complains that,

> in carefully reviewing the types of questions and answers received from the [veniremembers], it is clear that [the] motions to strike for cause should have been granted, that the obvious bias or prejudice of the juror[s] was made a [sic] manifest

early on in the examination, and only an eleventh-hour rehabilitation effort by the State gave them the appearance of neutrality.

Appellant does not explain the nature of the veniremembers' supposed "obvious bias or prejudice," however, other than to state in the abstract that "a prospective juror who cannot consider the full range of punishment is biased as a matter of law." Appellant also does not cite the specific pages, if any, in the record where the veniremembers' bias or prejudice was conclusively revealed; rather, appellant merely cites the entire record of the voir dire of each veniremember. Appellant also does not explain in any way why the State's efforts at rehabilitation were inadequate.

 Appellant's point of error is inadequately briefed and presents nothing for our review. First, the point fails to cite the pages in the record where the alleged errors are shown. *Narvaiz v. State*, 840 S.W.2d at 429; Tex.R.App.Proc. 74(d) and 210(b). As an appellate court, it is not our task to pore through hundreds of pages of record in an attempt to verify an appellant's claims. Second, the point does not explain why the State's efforts at rehabilitation were inadequate. See *Pierce v. State*, 777 S.W.2d 399, 418 (Tex.Crim.App.1989) (appellant must state legal theory relied upon), cert. denied, 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990); Tex.R.App.Proc. 74(f) and 210(b). Again, as an appellate court, it is not our task to speculate as to the nature of an appellant's legal theory. In short, appellant has not complied substantially with our briefing rules. See *Davis v. State*, 817 S.W.2d 345, 346 (Tex.Crim.App.1991); Tex.R.App.Proc. 74(p) and 210(b). We remind appellant that the right to appellate review extends only to complaints made in accordance with our rules of appellate procedure. *Foster v. State*, 779 S.W.2d 845, 864 (Tex.Crim.App.1989), cert. denied, 110 S.Ct. 1505 (1990). We overrule point of error number thirteen.

 In point of error number one, appellant argues that the trial court violated his Fourteenth Amendment right to due process of law when it denied his pretrial motion to suppress his written statement. Appellant argues that his statement was not given to the El Paso police voluntarily:

> [I]t is clear that [when appellant gave his statement, he] was intoxicated and mumbling, and probably, as it was stated in the evidence [at the suppression hearing], "higher than a kite." Obtaining a confession in a serious matter in this way, by filling in blanks in a computerized [statement] form, wholly misstating the date [on the form], and forcing a man who was obviously intoxicated and overborne by the whole process to submit to this process, is fundamentally wrong and renders any statement involuntary and inadmissible.

The State responds that "[t]he evidence [adduced at the suppression hearing] supports the trial court's finding that appellant ... voluntarily ... gave a confession without being under the influence of intoxicants."

The record reflects that the trial court conducted a suppression hearing before trial and that several witnesses, including appellant, testified. El Paso Police Officer Saul Medrano testified that he participated in the arrest of appellant at an El Paso residence on September 24, 1991. He testified further that, at the time of the arrest, he gave appellant the *Miranda*[7] warnings, that appellant appeared to understand those warnings, and that appellant appeared intoxicated with alcohol but still "very coherent as to what was happening." Medrano also testified that he transported appellant to the police station that night, that he remained with appellant throughout the interview process, that appellant was not stripped of his clothing or beaten or threatened or promised anything in return for his statement, and that appellant never requested a lawyer.

El Paso Police Detective Antonio Leyba testified that he interviewed appellant and took the statement in question from him at an El Paso police station late on the evening of September 24, 1991. Leyba testified further that he gave the *Miranda* warnings to appellant at the start of the interview, that appellant appeared to understand those warnings, that appellant was "coherent" and

---

7. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

did not appear intoxicated at any time during the interview, that appellant was not threatened or otherwise coerced or promised anything in return for his statement, and that appellant never requested a lawyer. Leyba also testified that he typed appellant's statement on a "fill-in-the-blank" form using a word processor, and that appellant's statement was erroneously dated "April 26, 1989" because of a software error.

El Paso Detention Officer Lance Brown testified that when appellant was brought to the El Paso County Jail after his arrest, his eyes "looked weird" and his behavior "wasn't normal." Brown testified further, however, that appellant appeared to understand what was said to him and what was occurring around him.

Jolene Martinez[8] testified that she was with appellant at the time of his arrest and that appellant was intoxicated with marihuana at that time. She also testified, however, that appellant understood what was said to him and what was happening around him.

Finally, appellant testified that he was intoxicated with marihuana at the time of his arrest and interview, and that because of the intoxication he did not fully understand what was said to him or what was happening around him. He testified further that, during the interview process, police officers attempted to intimidate him by cursing at him, stripping him to his underwear, striking him in the face with a boot, refusing his repeated requests for a lawyer, and forcing him to sit on a cold, steel desk. He also testified that the officers promised to "tell the judge to take it easy on [him]" if he would give a statement.

After the suppression hearing concluded, the trial court found, as matters of fact, that there was "nothing coercive in the way that the confession was taken," that "[t]he statement ... was freely and voluntarily made,"

that "[t]he defendant was not under a disability that rendered him incapable of waiving his rights," and that "[t]he defendant did not invoke his right to an attorney from the time of arrest through the taking of the statement."

■■■ Once a defendant moves to suppress a statement on the ground of "involuntariness," the due process guarantee requires the trial court to hold a hearing on the admissibility of the statement outside the presence of the jury. *Jackson v. Denno*, 378 U.S. 368, 380, 84 S.Ct. 1774, 1782–83, 12 L.Ed.2d 908 (1964). Article 38.22, § 6 and Texas Rule of Criminal Evidence 104(c) have the same requirement. At the hearing, the trial court is the sole judge of the weight and credibility of the evidence, and the trial court's finding may not be disturbed on appeal absent a clear abuse of discretion. *Alvarado v. State*, 853 S.W.2d 17, 23 (Tex.Crim. App.1993). The burden of proof at the hearing on admissibility[9] is on the prosecution, which must prove by a preponderance of the evidence that the defendant's statement was given voluntarily. *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986) (citing *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)).[10] A statement is "involuntary," for the purposes of federal due process, only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker. *Alvarado v. State*, 853 S.W.2d at 19, n. 4; *Smith v. State*, 779 S.W.2d 417, 427 (Tex.Crim.App.1989). "Absent [coercive] police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. at 164, 107 S.Ct. at 520.

The record evidence supports the trial court's finding that no official, coercive con-

---

**8.** In appellant's written statement (State's exhibit number 126), he referred to Martinez erroneously as "Joelynn."

**9.** No evidence regarding the voluntariness of appellant's statement was submitted at the guilt/innocence stage of trial. Had such evidence been submitted, the trial court would have been re-

quired to instruct the jury in accordance with Article 38.22, § 6.

**10.** Appellant does not argue, and therefore we have no occasion to consider, whether a higher standard of proof was required as a matter of state law. See *Griffin v. State*, 765 S.W.2d 422, 429 n. 13 (Tex.Crim.App.1989).

duct occurred with respect to the taking of appellant's statement. Therefore, we discern no abuse of discretion and overrule point of error number one.

■ In point of error number two, appellant argues that the trial court erred, at the guilt/innocence stage, in admitting State's exhibits 39, 41, 43, 44, 46, and 47 over his objection based on Rule 403 of the Texas Rules of Criminal Evidence.[11] Appellant argues that the exhibits (all photographs) were inadmissible because they were "shocking," "prejudicial beyond any probative value," and "needless[ly] cumulative." The State responds that the photographs were admissible because they merely depicted the gruesomeness of the crime scene as found by police. The record reflects that State's exhibits 39, 41, 43, and 44 were all five-inch by eight-inch photographs showing knife wounds inflicted on the victims' bodies, and that State's exhibits 46 and 47 were five-inch by eight-inch photographs showing Carmen Sustaita's entire body as it was found at the crime scene.

■ Once a defendant objects to photographic evidence on the ground its probative value is substantially outweighed by the danger of unfair prejudice, it is the task of the trial court to balance the probative value of the photographs against their potential for unfair prejudice. In accomplishing that task, the trial court must consider the inherent tendency, if any, that the photographic evidence has to encourage resolution of material issues on an improper emotional basis and then must balance that tendency, if any, against the host of factors affecting probativeness, including the relative weight of the evidence and the degree to which its proponent might be disadvantaged without it. *Narvaiz v. State*, 840 S.W.2d at 429. The trial court's decision may not be disturbed on appeal absent an abuse of discretion. *Id.*

Plainly, the photographs in question were probative of the State's case at the guilt/innocence stage, because they helped prove that the victims were murdered in a deliberate, vicious knife attack. Thus, the photographs

tended to prove that the crimes occurred as alleged in the indictment, and they tended to disprove appellant's claim of self-defense. Equally plain, however, is the fact that, in the context of all the State's evidence—which included much testimony regarding the crime scene and the victims' wounds—the probative value of the photographs was less than it otherwise would have been.

On the other hand, the photographs were not so horrifying that a juror of normal sensitivity would necessarily have difficulty rationally deciding the critical issues of the case after viewing them. Therefore, we are not persuaded that a reasonable trial judge would necessarily find that the danger of unfair prejudice substantially outweighed the probative value of the photographs.

■ With respect to appellant's claim that the photographs were inadmissible because they were needlessly cumulative, we note that appellant does not explain which photographs were cumulative, of what precisely they were cumulative, or why their presentation was needless. The photographs are plainly not cumulative of each other.

Rule 403 provides, in part, that relevant evidence may be excluded if its probative value is *substantially* outweighed by the countervailing consideration of the *needless* presentation of cumulative evidence. In the interpretation of this part of the rule, we find helpful the comments of Professors Goode, Wellborn, and Sharlot:

> ... Rule 403 authorizes exclusion of relevant evidence because of "considerations of undue delay, or needless presentation of cumulative evidence." These "considerations" are a necessary recognition of human mortality, and are well-recognized as legitimate bases for exclusion. Unlike the "danger" of unfair prejudice, confusion of issues, or misleading the jury, these factors are concerned with the efficiency of judicial proceedings rather than the threat of inaccurate decisions.

11. Rule 403 provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

Texas courts have recognized cumulativeness as a factor that may allow the exclusion of relevant evidence. "Cumulative" suggests that other evidence on the same point has been already received. But this fact, without more, is not a basis for exclusion. The rule pertains to the "needless presentation" of such evidence. Therefore, judges should be sensitive to the "right" of a party to make her case in the most persuasive manner possible. This may demand two or more witnesses or documents addressed to the same material issue, as where the evidence objected to as cumulative carries special weight because it comes from a disinterested source. Similarly, the evidence, although cumulative, may come in a form which enhances its effectiveness. In addition, the cumulative effect of the evidence may heighten rather than reduce its probative force.

Goode, Wellborn & Sharlot, *Guide to the Texas Rules of Evidence* § 403.3 at 135–136 (2nd ed. 1993) (emphasis added).

Assuming *arguendo* that some or all of the photographs were cumulative, appellant has shown us no basis for concluding that a reasonable trial judge would necessarily find that their probativeness was substantially outweighed by their detrimental effect on the efficiency of the trial process. In summary, we discern no abuse of discretion on the part of the trial court in the admission of the photographs. See *Narvaiz v. State*, 840 S.W.2d at 428–430; *Burdine v. State*, 719 S.W.2d 309, 317 (Tex.Crim.App.1986), cert. denied, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). We overrule point of error number two.

▇▇▇ In point of error number four, appellant argues that the trial court erred, at the guilt/innocence stage, in admitting State's exhibit 61 over his objection based on Rule 403. Appellant argues that the exhibit (a silent, ten-minute videotape of the crime scene) was inadmissible because it amounted to "the needless presentation of cumulative evidence and ... was inflammatory and prejudicial." He complains, too, that the videotape "presented a constant and changing view of the same scene, over and over." The State argues in response that, "[a]lthough the video-

tape may in a few portions be cumulative of the [still] photographs, it [was] important [to the State's case] because it show[ed] the overall crime scene to the jury." The State also argues that the videotape "show[ed] how the [victims'] house was ransacked."

The videotape depicts the interior and exterior of the victims' home on the evening of September 23, 1991, approximately one day after they were killed. The videotape offers a panoramic view of the crime scene, showing the general nature of the victims' wounds, the positions of their bodies, the locations of blood stains, and the general disarray of the home.

▇▇▇ Under Rule 403, the trial court's analysis of the admissibility of a silent videotape is the same as it is for still photographs. *Gordon v. State*, 784 S.W.2d 410, 411–412 (Tex.Crim.App.1990). And, as with the admissibility of still photographs, the trial court's decision may not be disturbed on appeal absent an abuse of discretion. *Id.* at 413.

For the same reasons discussed previously with respect to the admissibility of State's exhibits 39, 41, 43, 44, 46, and 47, we discern no abuse of discretion on the part of the trial court in the admission of State's exhibit 61. See *id.* We overrule point of error number four.

▇▇▇ In point of error number three, appellant argues that during the guilt/innocence stage the trial court erred in admitting a blood-stained dollar bill (State's exhibit number 57) found near Carmen Sustaita's body. Appellant complains that there was "certainly no testimony concerning the end of the chain of custody." The State responds that the chain of custody was adequately proven at trial.

We find the State's argument persuasive. Officer Dale Fernandez testified at the guilt/innocence stage that State's exhibit number 57 had the same serial number as the dollar bill he found at the crime scene. This was sufficient for admission absent any showing by appellant of tampering or alteration. *Stoker v. State*, 788 S.W.2d at 10; Tex.R.Crim.Evid. 901(b)(1).

■ Appellant also complains under this point of error that the trial court erred, at the guilt/innocence stage, in admitting State's exhibits 58, 59, and 60. Appellant complains that the exhibits (all empty envelopes) were inadmissible under Texas Rule of Criminal Evidence 402 because they were irrelevant to any issue in the case.[12] The State responds that any error in the admission of the envelopes was harmless beyond a reasonable doubt.[13]

Again, we find the State's argument persuasive. The empty envelopes were not incriminating in any way, and they did not place appellant in a poorer light. Therefore, assuming *arguendo* that the admission of the envelopes was error, we determine nonetheless, beyond a reasonable doubt, that the error made no contribution to appellant's conviction or punishment. See *Castillo v. State*, 810 S.W.2d 180, 184–185 (Tex.Crim. App.1990). We overrule point of error number three.

■ In point of error number five, appellant contends that the trial court erred, at the guilt/innocence stage, in admitting certain testimony by prosecution witness Joshua Salcido. Appellant complains of Salcido's testimony that, late on the evening of September 22, 1991, while Salcido was at the Cameron residence, Avila told him that Avila, Cameron, and appellant had "just took somebody out" and that Cameron had then explained that Avila had been referring to "Manny and his mom." Appellant argues that the testimony was hearsay and that it was not admissible as an adoptive admission (the theory of admissibility advanced by the State) because "Salcido ... could not adequately recall just who was in the room, the full details of the conversation, [or] whether appellant could even have heard the conver-

sation from his supposed position." The State responds that the testimony was admissible as an adoptive admission under Texas Rule of Criminal Evidence 801(e)(2)(B) because "the trial court had sufficient evidence before it to conclude that appellant ... was present, and ... within hearing distance of the statements made by ... Avila and Cameron, and that these statements clearly called for a response [because they] included appellant in the murders of the Sustaitas." [14] See *Tucker v. State*, 771 S.W.2d 523, 535, n. 5 (Tex.Crim.App.1988), cert. denied, 492 U.S. 912, 109 S.Ct. 3230, 106 L.Ed.2d 578 (1989); *Crestfield v. State*, 471 S.W.2d 50, 53 (Tex. Crim.App.1971), cert. denied, 406 U.S. 917, 92 S.Ct. 1764, 32 L.Ed.2d 115 (1972).

The record reflects that, after defense counsel objected to Salcido's testimony, the State questioned Salcido in an attempt to establish that his testimony was admissible under Rule 801(e)(2)(B):

Prosecutor: Was [appellant] in the room when these statements were made?

A: Yes, he probably—I think so, yes.

\* \* \* \* \* \*

Q: Was Steve Alvarado in the room and able to hear those statements?

A: No, I think he was, yes. I am pretty sure he was, the more I think about it.

\* \* \* \* \* \*

The Court: Okay. Repeat what they said.

A: Okay. They walked in, and Augie said they had taken somebody out.

The Court: Okay.

A: I asked them who. And David said that it was Manny and his mom.

The Court: Okay.

12. Rule 402 provides:

All relevant evidence is admissible, except as otherwise provided by constitution, by statute, by these rules or by other rules prescribed pursuant to statutory authority. Evidence which is not relevant is inadmissible.

13. Texas Rule of Appellate Procedure 81(b)(2) provides:

If the appellate record in a criminal case reveals error in the proceedings below, the ap-

pellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

14. Rule 801(e)(2)(B) provides:

A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement of which he has manifested his adoption or belief in its truth.

A: And then I can't remember whether Steven was in the room or not, but he—he said something about feeling good, and—

The Court: Well, how—how do you remember him saying that—how did you hear that?

A: Because he told it to me.

The Court: Then he must have been in the room.

A: He could have been in the kitchen, Your Honor. I don't remember.

\* \* \* \* \* \*

Prosecutor: And could Steve hear things in the kitchen? Is the house so small that you could hear stuff in the kitchen that's being said in the den and the living room?

A: Yes, if you talk loud enough.

Q: Very easily?

A: Yes.

Q: And was Steve and Dave—was Dave and Augie whispering when they told you this?

A: No. They were talking—they were pretty high.

Q: They were pretty loud?

A: They were kind of loud, kind of high. They were able to be heard.

\* \* \* \* \* \*

The Court: Well, I think—I think he said enough whereby the Court will allow it to go to the jury. We will just see what the jury can make out of that. They can give it whatever weight or completely disregard it. . . . So, I will overrule the objection.

■ The State, as the proponent of the evidence, had the burden of proving to the trial court, by a preponderance of the evidence, that Salcido's testimony qualified as an adoptive admission under Rule 801(e)(2)(B). *Meador v. State*, 812 S.W.2d 330, 333 (Tex.Crim.App.1991); Tex.R.Crim. Evid. 104(a); J. Strong, *McCormick on Evidence* § 53 at 214, n. 8 (4th ed. 1992). By admitting the testimony, the trial court implicitly found that the State carried its bur-

den. As an appellate court, we may not disturb the trial court's decision absent an abuse of discretion. *Coffin v. State*, 885 S.W.2d 140, 149 (Tex.Crim.App.1994).

We discern no abuse of discretion. The record reasonably supports the trial court's implicit finding that, on the night in question, appellant acquiesced by his silence in a statement that he heard and understood. We overrule point of error number five.

■ In point of error number six, appellant argues that the trial court erred, at the guilt/innocence stage, in admitting the testimony of El Paso Police Officer Robert Feverston, who testified as an expert on bloodstain pattern interpretation. Appellant argues that the admission of the testimony violated Texas Rule of Criminal Evidence 702 because Feverston was not qualified as an expert in any recognized discipline and because his testimony amounted to "speculation and conjecture." [15]

The record reflects that before the trial court decided to admit Feverston's testimony, he testified: that bloodstain pattern interpretation involved the visual examination of bloodstains on various types of surfaces for the purpose of determining how the bloodstains were deposited; that bloodstain pattern interpretation was based on general principles of physics and mathematics; that he had received more than 60 hours of training in the subject from the Houston and El Paso police departments; that he had read a book on the subject; and that the methods he used in his interpretation of bloodstains were of the type relied upon by experts in the field.

■ Under Rule 702, the trial court, before admitting expert testimony, must be satisfied that three conditions are met: (1) that the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) that the subject matter of the testimony is an appropriate one for expert testimony; and (3) that admitting the expert testimony will actually assist the

---

**15.** Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in

issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

factfinder in deciding the case. See Goode, Wellborn & Sharlot, *Guide to the Texas Rules of Evidence* § 702.2 at 13 (2nd ed. 1993). The trial court's decision may not be disturbed on appeal absent an abuse of discretion. *Joiner v. State,* 825 S.W.2d 701, 708 (Tex.Crim.App.1992), cert. denied, —— U.S. ——, 113 S.Ct. 3044, 125 L.Ed.2d 729 (1993).

■ We discern no abuse of discretion on the part of the trial court in the admission of Feverston's testimony. Based on the record before him, the trial court could have reasonably found, by a preponderance of the evidence, that: (1) Feverston, because of his training, qualified as an expert on bloodstain pattern interpretation; (2) lay persons were not qualified to the best possible degree to interpret bloodstain patterns and, therefore, expert testimony on that subject was generally appropriate;[16] and (3) Feverston's specialized knowledge would actually assist the jury in appellant's case in determining his guilt or innocence. We overrule point of error number six.

■ In point of error number twelve, appellant contends that the trial court erred "in improperly defining the requisite *mens rea* of capital murder" in that portion of the jury charge relating to the death of Carmen Sustaita. Appellant concedes he made no objection below but insists he was harmed "egregiously" because the charge authorized the jury to find him guilty of capital murder if it found merely that he *knowingly* caused Carmen's death during the course of robbery. Appellant argues that "the defense . . . fiercely argued that there was . . . insufficient evidence . . . to connect [him] with the death of [Carmen]; [a] jury wrangling with this contention might easily settle upon a lesser degree of culpability of knowingly causing [Carmen's] death, reasoning that . . . appellant did nothing intentional, but, in effect, 'knew' about it." The State responds that any error in the charge did not cause egregious harm.

The record reflects that the charge stated in relevant part:

A person commits the offense of capital murder if he *intentionally* causes the

death of an individual while in the course of committing, or attempting to commit the offense of robbery.

\* \* \* \* \* \*

Now, if you find from the evidence beyond a reasonable doubt that on or about the 22nd day of September, 1991, in El Paso County, Texas, the defendant, STEVE BRIAN ALVARADO, acting alone or as a party as that term has been defined herein, did *intentionally or knowingly* cause the death of REFUGIO CARMEN SUSTAITA by stabbing the said REFUGIO CARMEN SUSTAITA with a sharp instrument and said death was caused during the commission or attempted commission of the offense of robbery of REFUGIO CARMEN SUSTAITA, then you will find the defendant guilty of capital murder.

(Emphasis added.)

■ Appellant was indicted for the *intentional* capital murder of Carmen Sustaita under Texas Penal Code § 19.03(a)(2). Thus, the trial court erred in instructing the jury that it could find appellant guilty of her capital murder if it found merely that appellant *knowingly* caused her death during the course of robbery. *Richardson v. State,* 744 S.W.2d 65, 83–84 (Tex.Crim.App.1987); see 8 McCormick, Blackwell & Blackwell, *Texas Criminal Forms and Trial Manual* § 110.06 (10th ed. 1995). Since appellant made no objection below, however, "he will obtain a reversal only if the error [was] so egregious and created such harm that he has not had a fair and impartial trial." *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (internal quotes omitted). "[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.* "[I]n making our determination, we may presume that the jury acted rationally, at least absent a showing to the contrary." *Richardson v. State,* 879 S.W.2d 874, 882 (Tex.Crim. App.1993). Appellant has the burden of per-

---

**16.** See *Duckett v. State,* 797 S.W.2d 906, 910 (Tex.Crim.App.1990).

suasion with respect to the requisite degree of harm. *Abdnor v. State,* 871 S.W.2d 726, 732 (Tex.Crim.App.1994).

Appellant has shown us nothing in the record that supports his claim of egregious harm. Our independent examination of the record reveals no evidence, argument of counsel, or anything else that might have persuaded a rational jury that appellant, either alone or as a party, was guilty only of the knowing murder of Carmen Sustaita. Compare *Richardson v. State,* 879 S.W.2d at 882 (any error in charge harmless where, on record, a rational jury's deliberations would not have been affected by error). We therefore overrule point of error number twelve.

■ In point of error number nine, appellant contends that the trial court erred, at the punishment stage, in admitting the testimony of prosecution witness Gary Gagnon concerning uncharged misconduct on the part of appellant. Appellant, citing the Fourteenth Amendment due process clause, Article 39.14, and Texas Rule of Criminal Evidence 404(b), argues that the evidence was inadmissible because "the State failed to provide specific notice of its intent [to offer the evidence] after timely request by the defense."

We discern no reversible error. First, we need not address appellant's due process and Article 39.14 arguments because they were not raised in the trial court. See Tex.R.App. Proc. 52(a). Second, Rule 404(b), with its notice requirement, is not applicable to the punishment stage of a capital murder trial. *Adanandus v. State,* 866 S.W.2d 210, 233 (Tex.Crim.App.1993), cert. denied, — U.S. ——, 114 S.Ct. 1338, 127 L.Ed.2d 686 (1994). We overrule point of error number nine.

■ In point of error number ten, appellant argues that the trial court erred in refusing to allow the admission, at the punishment stage, of evidence of Carmen Sustaita's bad character. The evidence in question, preserved in an offer of proof, was the testimony of El Paso Police Officer David Martin and was to the effect that on September 7, 1990, Carmen Sustaita physically assaulted Martin while he was on official police business. Appellant argues that Carmen Sustai-

ta's bad character was a "circumstance" of her murder and that evidence thereof was admissible under Article 37.071, § 2(a). The record reflects that the trial court refused to admit the evidence because there was no accompanying evidence that, at the time of Carmen Sustaita's death, appellant was aware of her assault upon Martin.

Article 37.071, § 2(a) provides, in relevant part, that "[i]n the [punishment] proceeding [of a capital murder trial], evidence may be presented by the state and the defendant or the defendant's counsel as to any matter that the court deems relevant to sentence, including evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty." The evidence in question was clearly irrelevant to the jury's consideration of the special punishment issues submitted under Article 37.071, § 2(b). See footnote three, *supra.* The question, then, is whether the evidence was relevant to the jury's consideration of the special punishment issue on mitigation submitted under Article 37.071, § 2(e).

Within the meaning of Article 37.071, § 2(a), evidence "mitigates against the imposition of the death penalty" if a reasonable juror could conclude that the evidence was a basis for a sentence less than death. See *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). For example, evidence mitigates against the imposition of the death penalty if a reasonable juror could conclude that it showed that the defendant, if allowed to live, would be a model prisoner or that the defendant was less than fully blameworthy morally for his crime. In our view, however, a reasonable juror could not conclude that the victim's prior bad act (an assault on a police officer) tended to lessen the defendant's moral blameworthiness for the murder of that victim when the defendant was unaware of the victim's bad act. Thus, we find no abuse of discretion on the part of the trial court in refusing to admit Martin's testimony. Compare *State v. Southerland,* 447 S.E.2d 862, 867 (S.C.1994) (capital murder defendant has no Eighth Amendment right to present evi-

dence of victim's bad character).[17] Point of error number ten is overruled.

Finally, in point of error number eleven, appellant argues that his Fourteenth Amendment right to due process of law was violated when the trial court "allow[ed] the State to shift its burden of proof to the defense" at the punishment stage. Appellant's complaint concerns the State's cross-examination of two defense witnesses, Dr. Follett and Alvaro Taylor, both of whom testified that appellant's antisocial tendencies might be alleviated with medical treatment. The relevant portions of the cross-examination were as follows:

Prosecutor [to Dr. Follett]: Now, could you guarantee that with treatment a person like [appellant] would never commit murder again?

Defense Counsel: Your Honor, I object, because this goes to the burden of proof the State has harped on in voir dire over and over, the possibility and probability. There is no requirement that this witness prove for the State that it's a guarantee. We are simply talking about the probability and possibility problem.

Prosecutor: Your Honor, I am simply trying to find out how strong his opinion is.

The Court: Alright. Objection overruled.

Dr. Follett: I don't think I can make a guarantee just as I can't guarantee that you won't kill somebody. I mean, who knows? I am not God.

\* \* \* \* \* \*

Prosecutor [to Mr. Taylor]: So, you can't guarantee if Steven is allowed to go to prison he cannot continue to represent a danger, can he?

Defense Counsel: This witness has no position to guarantee.

Prosecutor: Judge, they have been going into this thing. I think I am entitled to rebut their entire theory here.

The Court: Fine. The objection is overruled.

Prosecutor: But you don't see someone who kills two people brutally, 34 stab wounds, three to the neck, the other person dying from 18 stab wounds, as a person who represents a danger to society?

A: I think, first of all, they possess a danger to themselves because someone in that capacity that would create and do such a crime has to be mentally unstable. I think you yourself are well aware of that.

Q: Okay. Do they represent a danger to other people?

A: If not given the proper care, yes.

We discern no violation of appellant's right to due process of law. The record reflects that the trial court charged the jury correctly on the State's burden of proof with respect to the punishment issues. See footnote three, *supra*. Thus, on this record, we see no reasonable likelihood that the jury was misled as to the correct burden of proof. We overrule point of error number eleven.

Having found no reversible error, we AFFIRM the judgments of the trial court.

OVERSTREET, J., concurs in the result.

CLINTON, J., dissents.

BAIRD, Judge, concurring.

Believing the majority fails to adequately address appellant's tenth and twelfth points of error, I offer the following comments.

**I.**

In his tenth point of error, appellant contends he was entitled under Tex.Code Crim. Proc.Ann. art. 37.071 to present evidence that one of the victims had previously assaulted a police officer. Relying upon the principle enunciated in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)[1], appellant contends the assault con-

17. In *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court held that the Eighth Amendment does not bar the State from offering or the jury from considering evidence of the good character of the victim in the jury's assessment of the defendant's moral culpability for the death of the victim. *Payne,* however, did not hold or suggest that the

Eighth Amendment grants a defendant the right to present evidence of the victim's bad character.

1. Although appellant's discussion on the admissibility of victim impact evidence and "reciprocal victim impact evidence" is based upon *Payne, supra,* appellant does not cite that case.

stituted "reciprocal victim impact evidence." He argues this type of evidence is admissible in mitigation of the death penalty because it shows "society has not lost that much of a valuable asset" by the victim's death. *Appellant's Brief,* pg. 33. Thus, appellant suggests his moral culpability for the death penalty is lessened by evidence of the victim's own "deathworthiness." *Id.,* at 35–36.

Although appellant's contentions clearly implicate the Supreme Court's decision in *Payne,* the majority's cursory dismissal of this issue does nothing to provide guidance concerning *Payne*'s applicability to the Texas capital sentencing scheme.[2] Consequently, because one "purpose of an appellate opinion is to ... instruct the bench and bar on legal principles for future application," *Matamoros v. State,* 901 S.W.2d 470, 479 (Tex.Cr.App.1995) (Baird, J., concurring), I

write separately to address appellant's contention.

### A.

In *Payne v. Tennessee,* the Supreme Court was faced with whether the Eighth Amendment prohibited a capital sentencing jury from considering evidence relating to the personal characteristics of the victim, and the emotional impact of the crime on the victim's family. *Id.,* 501 U.S. at 817–18, 111 S.Ct. at 2604. In addressing the admissibility of "victim impact evidence," the Court re-examined its holdings in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), where the Court held such evidence was *per se* inadmissible to the extent that it did not directly relate to the circumstances of the offense.[3]

---

**2.** The majority holds only that "a reasonable juror could not conclude that the victim's prior bad act ... tended to lessen the defendant's moral blameworthiness for the murder of that victim when the defendant was unaware of the victim's bad act," *ante,* 912 S.W.2d at 217, and briefly states in a footnote that *"Payne ...* did not hold or suggest that the Eighth Amendment grants a defendant the right to present evidence of the [victim's] bad character." *Ibid.,* n. 20.

**3.** In *Booth,* the Court held the introduction of a victim impact statement in a capital sentencing hearing violated the Eighth Amendment because such evidence was irrelevant to the defendant's individual characteristics and the circumstances of the crime. *Id.,* 482 U.S. 496, 508, 107 S.Ct. 2529, 2536 (1987). The Court reasoned:

> While the full range of foreseeable consequences of a defendant's actions may be relevant in other criminal and civil contexts, we cannot agree that it is relevant in the unique circumstance of a capital sentencing hearing. In such a case, it is the function of the sentencing jury to "express the conscience of the community on the ultimate question of life or death." *Witherspoon v. Illinois,* 391 U.S. 510, 519, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776 (1968). When carrying out this task the jury is required to focus on the defendant as a "uniquely individual human bein[g]." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976) (plurality opinion of Steward, Powell, and Stevens, JJ.) The focus of a [victim impact statement],

however, is not on the defendant, but on the character and reputation of the victim and the effect on his family. These factors may be wholly unrelated to the blameworthiness of a particular defendant. As our cases have shown, the defendant often will not know the victim, and therefore will have no knowledge about the existence or characteristics of the victim's family. Moreover, defendants rarely select their victims based on whether the murder will have an effect on anyone other than the person murdered. Allowing the jury to rely on a [victim impact statement] therefore could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill. This evidence thus could divert the jury's attention away from the defendant's background and record, and the circumstances of the crime.

*Booth,* 482 U.S. at 504–505, 107 S.Ct. at 2533–2534. Thus, the Court explained that victim impact evidence could "serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Id.,* 482 U.S. at 509, 107 S.Ct. at 2536.

In *Gathers,* the Court relied upon *Booth, supra,* to hold that the prosecutor's comments on the personal characteristics of the victim during the State's closing argument at the capital sentencing hearing were improper because they did not relate to the defendant's personal characteristics or the circumstances of the crime. *Gathers,* 490 U.S. at 810–812, 109 S.Ct. at 2210–2211.

In re-evaluating the exclusion of victim impact evidence, the Court rejected the two premises underlying *Booth:* first, that victim impact evidence is irrelevant to a defendant's moral culpability for the offense; and, second, that only evidence of moral culpability is relevant to a capital sentencing decision. *Payne,* 501 U.S. at 818–19, 111 S.Ct. at 2605. The Court noted that since the late Eighteenth Century, penal theory has increasingly focused upon the amount of harm as a measure of the crime's severity and consequent punishment. *Id.,* 501 U.S. at 819–20, 111 S.Ct. at 2605–2606. The Court further noted a growing acceptance in American jurisprudence of consideration of the harm resulting from an offense as a relevant factor to sentencing. *Id.,* 501 U.S. at 820–22, 111 S.Ct. at 2606 (citing S. Wheeler, K. Mann, and A. Sarat, *Sitting in Judgment: The Sentencing of White–Collar Criminals* 567 (1988)).

In reviewing *Booth*'s exclusion of victim impact evidence, the Court explained *Booth* misread the language from *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), which directs the jury's deliberations to a defendant's personal characteristics, as a limitation upon the evidence which may be considered at capital sentencing. *Payne,* 501 U.S. at 820–24, 111 S.Ct. at 2606–2607. The Court explained however, that "the language quoted from *Woodson* in the *Booth* opinion was not intended to describe a class of evidence that *could not* be received, but a class of evidence which *must* be received." *Payne,* 501 U.S. at 824, 111 S.Ct. at 2607 (emphasis in original). Thus, the Court criticized *Booth* as creating an unbalanced perspective of the offense by highlighting the defendant's personal characteristics but otherwise excluding the victim's personal characteristics, or the effects of the offense upon others. *Payne,* 501 U.S. at 822–24, 111 S.Ct. at 2607.

The Court examined those limitations precluding the imposition of the death penalty under the Eighth Amendment and determined that victim impact evidence falls outside these constitutional limitations.[4] 501 U.S. at 824–26, 111 S.Ct. at 2608. The Court further stated that whether such evidence is relevant to capital sentencing lies within the State's discretion in enacting capital punishment procedures:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Booth,* 482 U.S., at 517, 107 S.Ct. at 2540 (White, J., dissenting).

*Payne,* 501 U.S. at 825, 111 S.Ct. at 2608. Thus, the Court held:

> ... if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on the subject, the Eighth Amendment erects no *per se* bar. A state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Payne,* 501 U.S. at 827, 111 S.Ct. at 2609.

---

4. The Court stated:
 ... Where the State imposes the death penalty for a particular crime, we have held that the Eighth Amendment imposes special limitation upon that process.
 "First, there is a required threshold below which the death penalty cannot be imposed. In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold. Moreover, a societal consensus that the death penalty is disproportionate to a particular offense prevents a State from imposing the death penalty for that offense. Second, States cannot limit the sentencer's consideration of any relevant circumstances that could cause it to decline to impose the penalty. In this respect, the State cannot challenge the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant." *McCleskey v. Kemp,* 481 U.S. 279, 305–306, 107 S.Ct. 1756, 1774–1775, 95 L.Ed.2d 262 (1987).
 *Payne,* 501 U.S. at 824, 111 S.Ct. at 2607–2608.

## B.

Since *Payne* a number of state courts have held that victim impact evidence is admissible at the sentencing phase of capital trials. *See, State v. Gentry,* 125 Wash.2d 570, 888 P.2d 1105, 1136–38 (1995) (Admission of victim impact evidence does not violate Washington Constitution because in light of victim's rights amendment to Washington constitution, such evidence is relevant to jury's decision whether to impose death penalty.); *Freeman v. State,* 876 P.2d 283, 289 (Okl.Cr. 1994); *State v. Robinson,* 339 N.C. 263, 451 S.E.2d 196, 205 (1994); *Weeks v. Commonwealth,* 248 Va. 460, 450 S.E.2d 379, 389 (1994) ("[V]ictim impact evidence is relevant to punishment in a capital murder prosecution in Virginia. . . ."); *State v. Rodriguez,* 656 A.2d 262, 275 (Del.Super.Ct.1994) ("The Delaware Supreme Court has concluded that under Delaware's death penalty statute there is no reason to treat victim impact evidence any differently than other relevant evidence is treated. . . ."); *State v. Maxwell,* 647 So.2d 871, 871 (Fla.App. 4 Dist.1994) (While not an aggravating factor, victim impact evidence is relevant under Florida Constitution and capital sentencing statutes.); *State v. Southerland,* 447 S.E.2d 862 (S.C.1994); *Evans v. State,* 333 Md. 660, 637 A.2d 117, 130 (1992) ("It is apparent that the [Maryland] legislature intended that victim impact statements be admissible in capital case sentencing proceedings."); *and, People v. Howard,* 147 Ill.2d 103, 167 Ill.Dec. 914, 937, 588 N.E.2d 1044, 1067 (1992) ("[W]e do not believe anything in the Illinois Constitution automatically forbids [the introduction of victim impact evidence] at a capital sentencing hearing.").

However, acceptance of victim impact evidence has not been unanimous. *See, State v. Carter,* 888 P.2d. 629 (Utah 1995); *State v.*

*Metz,* 131 Or.App. 706, 887 P.2d 795, 800–803 (1994) (Victim impact evidence not relevant to answering any of the statutory issues under Oregon's capital punishment statute.); *Sermons v. State,* 262 Ga. 286, 417 S.E.2d 144, 146 (1992) (Victim impact evidence is not admissible under Georgia capital sentencing statute as an aggravating factor.); *and, State v. Atwood,* 171 Ariz. 576, 656–57, 832 P.2d 593, 673–674 (1992) (Victim impact evidence is not admissible under Arizona capital punishment statute because it does not tend to establish statutorily enumerated aggravating circumstances.).

In *State v. Carter,* 888 P.2d 629, the Utah Supreme Court addressed a challenge to the admission of victim impact evidence under Utah's capital sentencing statute.[5] The Court held victim impact evidence is not admissible under the capital sentencing statute because it is neither relevant to the sentence, nor has probative value as to the defendant's deathworthiness. *Id.,* at 651. The Court explained:

> . . . the primary goal in [a capital] sentencing phase is to acquire a thorough acquaintance with the character and history of the person before the court. . . . Permitting the State to introduce victim impact evidence shifts the focus of the proceeding from the defendant to the victim and the effect of the murder on the victim's family and community. This adds nothing to the culpability analysis and is fraught with danger. . . . Aside from causing the jury to lose sight of its immediate task, the shift suggests that some victims are more valuable to society and/or deserve more sympathy than others. Further, a judge or jury considering the victim impact evidence is more likely to empathize with the family's tragedy, perhaps asking, "What if I, or a member of my family, were the murder victim?" Such empathy dangerously increases the possibility of improper passion or prejudice. . . .

5. Utah Code Ann. § 76–3–207(2) provides in pertinent part:

> In these sentencing proceedings, evidence may be presented as to any matter the court deems relevant to sentence, including but not limited to the nature and circumstances of the

crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court deems to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence.

[Moreover] ... we find that victim impact evidence simply has no probative force in the sentencing context. Such evidence does not make it more or less likely that a defendant deserves the death penalty. In our society, individuals are of equal value and must be treated that way. We will not tempt sentencing authorities to distinguish among victims—to find one person's death more or less deserving for retribution merely because he or she was held in higher or lower regard by family and peers. Such a scheme draws lines in our society that we think should not be drawn. The worth of a human life is inestimable, and we do not condemn those who take life more or less harshly because of the perceived value or quality of the life taken.

*Carter*, 888 P.2d at 652 (citations and quotations omitted).

This Court has yet to decide whether victim impact evidence is relevant under the Texas capital sentencing scheme, art. 37.071, and it is clear that the majority declines to do so today.

## C.

Turning to the case at hand, the majority relies upon *State v. Southerland*, 447 S.E.2d 862 (S.C.1994), to hold *Payne* does not permit the introduction of evidence of a victim's bad character. *Ante*, 912 S.W.2d at 217. In *Southerland*, the defendant contended he was entitled under *Payne* to introduce evidence of the victim's involvement with drugs and prostitution as mitigating against the death penalty. *Id.*, 447 S.E.2d at 867. The South Carolina Supreme Court rejected the defendant's contention, however, explaining that "*Payne* prohibits th[e] use of comparative character evidence." *Id.*, 447 S.E.2d at 867.

*Southerland*'s holding merely brings to the fore the contradictions within *Payne*'s reasoning. Although *Payne* holds the admission of victim impact evidence is not intended to re-focus the trial upon the victim's character, or to encourage comparative judgments between victims, 501 U.S. at 823, 111 S.Ct. at 2607, it is nonetheless clear that by concentrating on the victim's personal characteristics, or the results of the offense upon the survivors, the jury will inevitably, if unintentionally, base their judgment in part upon the victim's personal achievements (or failures) and the number of people impacted by the crime.

Moreover, assuming victim impact evidence is admissible under art. 37.071, simple fairness dictates that "[i]f the State is allowed to introduce evidence of the victim's great value to society, the defense must arguably be permitted to rebut that showing with degrading evidence tending to demonstrate lack of worth." *Carter*, 888 P.2d at 652 (citing *State v. Bernard*, 608 So.2d 966, 971, n. 7 (La.1992)). Certainly, *Payne* implies evidence of a victim's *bad* character is admissible, at the very least in the form of rebuttal evidence. *Id.*, 501 U.S. at 823, 111 S.Ct. at 2607. Additionally, since the relevancy of victim impact evidence is clearly not conditioned upon the defendant's actual knowledge of the victim's personal characteristics or circumstances, *Payne*, 501 U.S. at 835, 111 S.Ct. at 2614 (Souter J., joined by Kennedy, J., concurring), it is equally clear that a defendant need not know of the personal characteristics of the victim in order to present evidence of a victim's bad character. And finally, assuming victim impact evidence is admissible under art. 37.071, due process would undoubtedly require "reciprocal victim impact evidence" be admissible in order for the jury to fully consider the victim as an individual. Accordingly, assuming *arguendo* that the evidence of the victim's prior assault on a police officer was admissible in the instant case, the trial judge erred in excluding this evidence at the punishment phase. However, I would hold the error made no contribution to the punishment. *Burks v. State*, 876 S.W.2d 877, 905 (Tex.Cr.App.1994); *Harris v. State*, 790 S.W.2d 568, 585–588 (Tex.Cr.App.1989); *and*, Tex.R.App.P. 81(b)(2).

At the punishment phase, appellant sought to introduce evidence of an assault committed by the victim against a police officer approximately a year before the instant offense. The trial judge excluded the evidence and appellant set out the testimony in a bill of exception. The officer testified that in

September 1990 while conducting an investigation in front of the victim's house, the victim engaged him in a verbal altercation. During the altercation, the victim grabbed the officer's shirt and slapped his face. The victim was arrested for aggravated assault on a police officer but was never tried for the offense.

The excluded evidence, however, is not the only evidence probative of the victim's character. During the guilt-innocence phase, the State and appellant elicited testimony indicating the victim was heavily involved in drug dealing. One of the victim's daughters testified she suspected her mother sold drugs and another daughter admitted the victim sold marihuana and cocaine. Because the victim lived across the street from a high school, many of her customers were teenagers. Appellant emphasized the fact that the victim was a drug dealer during his opening and closing arguments. Although the evidence of the victim's slap of a police officer may have been admissible, it is insignificant when compared to the evidence of her drug dealing. Consequently, in determining whether the victim's bad character made appellant any less deathworthy, it is unlikely a juror would have attached any additional weight to the victim's slap of a police officer.

In addition, the mitigating value of the excluded evidence is insignificant in relation to the State's evidence militating toward the death penalty. The State presented evidence that appellant was involved in satanic rituals, possibly involving child mutilation. The State also presented evidence appellant possessed a large number of sharp edged weapons and that appellant had a reputation for carrying knives. The State presented evidence of prior assaults by appellant involving weapons. On one occasion, appellant threatened a person with a knife. On another, police were called to appellant's home after appellant threatened his mother with a hatchet. Appellant locked himself in his bedroom and attempted to shoot arrows through the door, threatening to kill any officer who attempted to enter. Deputies assigned to the El Paso County jail, where appellant was incarcerated pending trial, testified that "shanks" were discovered in appellant's cell on two separate occasions. Finally, a psychologist who had treated appellant for psychological problems after the "hatchet incident" testified appellant had a "full-blown antisocial personality disorder." Taken together, the probative value of the evidence militating toward appellant's deathworthiness overshadows the evidence of the victim's assault on a police officer. Thus, I believe the exclusion of that evidence made no contribution to the jury's resolution of the statutory punishment issues. Consequently, the trial judge's exclusion of the evidence, *if* error, was harmless.

## II.

Turning to appellant's twelfth point of error, appellant contends the trial judge erred in submitting a jury charge which did not limit the culpable mental state necessary for the offense of capital murder. Appellant contends failure to limit the culpable mental state in the application portion of the jury charge to "intentionally" permitted the jury to convict for conduct which did not constitute capital murder. *Appellant's Brief,* pp. 39–40. The majority acknowledges this was error, but subsequently holds the error to be harmless. Op., *ante* pp. 216–17. While this conclusion is accurate, I believe our analysis of this point should be more fully developed.

## A.

At trial, the trial judge submitted the following instructions in the jury charge:

### 1.

Our law provides that a person commits murder if he intentionally or knowingly causes the death of an individual.

A person commits the offense of capital murder if he intentionally causes the death of an individual while in the course of committing, or attempting to commit the offense of robbery. Robbery and attempted robbery are felonies.

\* \* \* \* \* \*

### 6.
### COUNT II.

Now, if you find from the evidence beyond a reasonable doubt that on or about

the 22nd day of September, 1991, in El Paso County, Texas, the defendant STEVEN BRIAN ALVARADO, acting alone or as a party as that term has been defined herein did *intentionally or knowingly* cause the death of [the victim] by stabbing [the victim] with a sharp instrument and said death was caused during the commission or attempted commission of the offense of robbery of [the victim], then you will find the defendant guilty of capital murder.

\* \* \* \* \* \*

9.

COUNT III.

Now, if you find from the evidence beyond doubt that on or about the 22nd day of September, 1991, in El Paso County, Texas, the defendant, STEVEN BRIAN ALVARADO, acting alone or as a party as that term has been defined herein, did *intentionally or knowingly* cause the death of [the victim] by stabbing [the victim] with a sharp instrument and said death was caused during the commission or attempted commission of the offense of robbery of [the victim], then you will find the defendant guilty of capital murder.[6]

Although the definition portion of the jury charge limited a finding of capital murder to a finding of the intentional causation of the victims' deaths, the application paragraphs authorized conviction of capital murder if the jury found appellant intentionally or *knowingly* caused the victims' deaths. Therefore, resolution of this point depends upon whether the application paragraph mislead the jury into convicting appellant of capital murder on a culpable mental state not authorized by law.

B.

The jury charge is the exclusive instrument upon which the jury receives its instruction on the law and, therefore, it is essential to a defendant's right to a fair trial that the charge accurately state the law. *Dinkins v. State,* 894 S.W.2d 330, 339 (Tex. Cr.App.1995); *Abdnor v. State,* 871 S.W.2d 726, 731 (Tex.Cr.App.1994); *and, Johnson v.*

*State,* 571 S.W.2d 170, 173 (Tex.Cr.App.1978) ("It is well established that a correct instruction of the law relating to the offense must be given to the jury."). A jury charge is erroneous if it authorizes a conviction for conduct which is not an offense. *Garcia v. State,* 640 S.W.2d 939, 941 (Tex.Cr.App.1982) (Panel Op.); *Escamilla v. State,* 612 S.W.2d 608, 609 (Tex.Cr.App.1981); *Cumbie v. State,* 578 S.W.2d 732, 734 (Tex.Cr.App.1979) (Panel Op.); *and, Santoscoy v. State,* 596 S.W.2d 896, 902 (Tex.Cr.App.1980). In particular, the jury charge is erroneous if it permits a conviction on a culpable mental state which is not prescribed by statute. *Garcia,* 640 S.W.2d at 941 (Charge erroneously authorized conviction for hindering arrest on culpable mental state of "knowingly" when offense requires culpable mental state of "intentionally."); *Hawkins v. State,* 579 S.W.2d 923, 925 (Tex.Cr.App.1979) (Panel Op.) (Charge erroneously authorized conviction for aggravated robbery based on *recklessly* threatening and placing in fear, which is not culpable mental state for that theory of robbery.); *Jackson v. State,* 576 S.W.2d 88, 89–90 (Tex.Cr.App.1979) (same); *and, Dowden v. State,* 537 S.W.2d 5, 6–7 (Tex.Cr. App.1976) (same). Accordingly, the jury charge must limit the culpable mental states alleged therein to the culpable mental states applicable to the charged offense. *Cf., Cook v. State,* 884 S.W.2d 485, 491 (Tex.Cr.App. 1994).

Texas Penal Code § 19.03(a)(2) provides "[a] person commits an offense if he commits murder as defined under § 19.02(a)(1) ... and ... the person *intentionally* commits the murder in the course of committing or attempting to commit ... robbery." *Richardson v. State,* 744 S.W.2d 65, 84 (Tex.Cr. App.1987); *Demouchette v. State,* 731 S.W.2d 75, 80 (Tex.Cr.App.1986); *and, Santana v. State,* 714 S.W.2d 1, 9 (Tex.Cr.App.1986). Thus, a prosecution under § 19.03(a)(2), requires not only the underlying murder be committed intentionally or knowingly, but further requires the murder to have been committed intentionally in the course of committing a specific felony. *Richardson,* 744 S.W.2d at 84. For all practical purposes, this

---

**6.** All emphasis is supplied by author unless otherwise indicated.

means that the defendant may be convicted of capital murder under § 19.03(a)(2) only if he is found to have intentionally committed murder in the course of committing a specific felony; a "knowing" murder is insufficient to sustain a conviction for capital murder. *Demouchette*, 731 S.W.2d at 80. In the instant case, the jury charge was erroneous because it authorized a conviction upon a finding that appellant committed the murder either intentionally *or* knowingly. *Abbott v. State*, 751 S.W.2d 305, 308 (Tex.App.—San Antonio 1988) (Court of Appeals found jury charge erroneous where application paragraph authorized conviction for § 19.03(a)(2) on an intentional or knowing murder.). Consequently, the trial judge erred in submitting a charge which authorized a capital murder conviction based upon a knowing murder.

However, the inquiry does not stop at the finding of error. It is incumbent upon a reviewing court to determine whether the error mandates reversal. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Cr.App.1984); *and,* Tex.Code Crim.Proc.Ann. art. 36.19. Where, as in the instant case, the error is raised for the first time on appeal, the court will only reverse for "egregious harm," that is, the error must be so harmful as to deny the defendant a fair and impartial trial. *Almanza*, 686 S.W.2d at 171; *and, Arline v. State*, 721 S.W.2d 348, 351 (Tex.Cr.App.1986). In determining the degree of harm, the court examines the jury charge itself, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other information contained in the record. *Almanza*, 686 S.W.2d at 171.

I believe the majority is correct in holding appellant suffered no egregious harm from the erroneous jury charge. The State did not argue to the jury that appellant "knowingly" murdered the victims. There is no evidence to suggest that appellant only committed a knowing murder, rather than an intentional murder. Nor is it apparent the jury convicted appellant based upon the incorrect theory of the offense. Texas law provides "the verdict in every criminal action must be general." Tex.Code Crim.Proc.Ann. art. 37.07, § 1(a). A conviction will be sustained where a general verdict is returned and the evidence is sufficient to support a finding of guilt under any of the theories submitted. *Fuller v. State*, 827 S.W.2d 919, 931 (Tex.Cr.App.1992); *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex.Cr.App.1991); *Aguirre v. State*, 732 S.W.2d 320, 326 (Tex. Cr.App.1982) (Panel Op.); *and, Bailey v. State*, 532 S.W.2d 316, 323 (Tex.Cr.App.1975). The jury charge authorized a conviction upon two "theories" of the offense: one theory constituted the offense of capital murder, and the other did not. However, because the verdict was general, and the evidence supports the permissible theory, it is just as likely the jury convicted appellant on the permissible theory than the forbidden one.

Finally, it is unlikely the jury was seriously misled by the erroneous instruction in the jury charge because of the conceptual similarity between the culpable mental states of "intentionally" and "knowingly." *See,* Tex.Penal Code Ann. § 6.03 (Seth S. Searcy III & James R. Patterson, Practice Commentary) (Vernon 1974). Indeed, it is often difficult to draw a meaningful distinction between intentional conduct, and knowing conduct. As Searcy and Patterson explain in their practice commentary to the 1974 Penal Code:

> *In the context of a result-type offense element*—death, property damage or destruction, fraud, for example—*the distinction between knowing and intentional is narrow, and is preserved only because of the criminal law's traditional creation of specific intent offenses* such as burglary, arson, and theft. *We say "only" because there is little difference, in terms of blameworthiness, between one who wills a particular result and one who is willing for it to occur*—between, for example, one who blows up a home intending to kill the occupants and one who blows up the adjoining shop intending to burglarize it knowing, however, that the home is occupied; or between one who shoots into a moving car, intending to kill the driver, and one who shoots into a moving car he knows is occupied. The formulated distinction between intentional and knowing, as to results, is thus between desiring the result and being reasonably certain that it will occur. . . . The distinction is not often

made in defining offenses in the code—most offenses can be committed either intentionally or knowingly—but, as mentioned earlier, some offenses require a specific intent to cause a certain result—for example, a felony or theft, a fire or explosion, permanent deprivation of property rights.

Penal Code § 6.03 (Practice Commentary). *See also, Mayes v. State,* 819 S.W.2d 877 (Tex.App.—Tyler 1987), *rev'd on other grounds,* 816 S.W.2d 79 (Tex.Cr.App.1991). Consequently, because of the conceptual similarly between intentionally and knowingly causing a person's death, the erroneous instruction in the jury charge was not egregious and did not deny appellant a fair and impartial trial.

With these comments, I join only the judgment of the Court.

MEYERS, J., joins this opinion.

MALONEY, Judge, concurring.

I concur with the result reached by the majority, but write separately to address the issue of the burden of proof at a hearing under Tex.Code Crim.Proc.Ann. art. 38.22, § 6.[1] Although the appropriate standard for admissibility of an accused's statement has not yet been decided by this Court, the majority states, without any analysis, that the prosecution's burden of proof at a hearing to determine the admissibility of a statement is preponderance of the evidence. *Majority op. at* 211. For the following reasons, I would find the appropriate burden of proof is beyond a reasonable doubt.

Appellant argued that his confession was involuntary. Pursuant to Article 38.22, § 6 the trial court conducted a pre-trial suppression hearing. At the conclusion of the suppression hearing, the trial court found that defendant's confession was freely and voluntarily given, and therefore admissible. The trial court did not state the standard it used to reach its decision. The trial court's findings were made orally and there are no

written findings of fact or conclusions of law included in the record.

## I.

In *Lego v. Twomey,* the United States Supreme Court held that the prosecution in a suppression hearing must prove at least by a preponderance of the evidence that the confession was voluntary. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1971). The Court continued, stating "[s]tates are free, pursuant to their own law, to adopt a higher standard." *Id.* Accordingly, a review of Texas statutes and caselaw is necessary to resolve this issue.

We have been inconsistent in our holdings regarding the proper standard for admissibility of an accused's statement. Early on, this Court noted that "it devolves on the prosecution to satisfy to the court" that a confession was voluntarily made. *Cain v. State,* 18 Tex. 387, 391 (1857). Later, *Griffin v. State,* cited by the majority, acknowledged that this Court had yet to decide whether the constitutionally minimal preponderance of the evidence standard or a higher standard of proof be required in proving a confession admissible. *Griffin v. State,* 765 S.W.2d 422, 429–30 n. 13 (Tex.Crim.App.1989); *see also Farr v. State,* 519 S.W.2d 876, 879–80 n. 3 (Tex.Crim. App.1975); *Valerio v. State,* 494 S.W.2d 892, 896 n. 2 (Tex.Crim.App.1973); *Nash v. State,* 477 S.W.2d 557, 564 n. 6 (Tex.Crim.App. 1972). In other cases, while not mentioning the lack of a definitive standard, this Court affirmed trial courts' findings that the evidence supported beyond a reasonable doubt that the defendant's confession was voluntary. *See Melton v. State,* 790 S.W.2d 322, 324 (Tex.Crim.App.1990) (noting trial court found State proved beyond a reasonable doubt confession was voluntary); *Davis v. State,* 499 S.W.2d 303, 307 (Tex.Crim.App. 1973) (opinion on reh'g) (upholding trial court's finding beyond a reasonable doubt statement voluntary); *see also Meeks v. State,* 897 S.W.2d 950, 954 (Tex.App.—Fort Worth 1995, no pet.) (holding evidence sufficient beyond a reasonable doubt to support trial court's finding at suppression hearing that confession voluntary).

1. While I recognize that appellant does not argue what standard of proof is required, I believe the standard for admissibility is inextricably connected to the issue before us and must be addressed.

## II.

Our statutes provide guidance on this issue. Article 38.22, § 6 provides in pertinent part:

> In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions. If the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made,
> .... Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose....

Tex.Code Crim.Proc.Ann. art. 38.22, § 6. This article has always required that if the court finds the accused's statement to be voluntary, upon introduction of evidence at trial before the trier of fact, the jury must be instructed it can consider the statement only if it believes *beyond a reasonable doubt* that it was made voluntarily.[2] *See* Acts 1965, 59th Leg., vol. 2, p. 317, ch. 722, *amended by* Acts 1967, 60th Leg., p. 1740, ch. 659, § 23 and Acts 1977, 65th Leg., p. 935, ch. 348, § 2.

I find the standard applied to juries instructive on this issue based upon the same reasoning this Court used in *Harrell v. State,* 884 S.W.2d 154 (Tex.Crim.App.1994). The issue in *Harrell* concerned the burden of proof for admissibility of extraneous offense evidence. *Id.* at 155. We noted that the standard for admissibility by the trial court was consistent with the requirement that a trial court instruct the jury not to consider extraneous offense evidence unless it believes beyond a reasonable doubt that the defendant committed such offense. *Id.* at 158.

We recognized it was illogical for the trial court to admit evidence using a certain standard for admissibility, but then to instruct the jury not to consider the same evidence unless the jury was convinced by a different standard that it was admissible. *Id.* The same reasoning applies to the instant case.

Accordingly, for the above reasons, I would find that "beyond a reasonable doubt" is the standard for admissibility of a confession.

---

2. The predecessors to Article 38.22, § 6 do not raise this issue. They neither require a pre-trial hearing on voluntariness nor specific instructions to the jury. *See* Article 790, C.C.P. (1896) as amended by Acts of 1907; Article 727, C.C.P. (1925).