

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1917-06

**RAUL ADAM MARTINEZ, JR., Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRTEENTH COURT OF APPEALS
### HARRIS COUNTY

HERVEY, J., filed a dissenting opinion in which KELLER, P.J., MEYERS and KEASLER JJ., joined.

### DISSENTING OPINION

The federal constitutional decision in *Miranda v. Arizona*[1] establishes the prophylactic rule

that an in-custody suspect must be "warned" that he has certain rights, such as the right to remain

silent, before the police can question the suspect. In this case, appellant basically claims that, even

though he received these warnings before he voluntarily made a custodial videotaped statement to

---

[1] 384 U.S. 436, 478-79 (1966).

the police, these warnings nevertheless failed to "adequately and effectively" apprise him of his rights under *Miranda*.

The majority opinion appears to decide that Justice Kennedy's one-judge concurring opinion in *Missouri v. Seibert*[2] contains the Court's holding in that case. S*ee Marks v. United States*, 430 U.S. 188, 193 (1977) (where "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds") (internal quotes omitted).[3] The majority opinion also appears to decide that appellant wins under the "holding" in Justice Kennedy's concurring opinion in *Seibert*, because the incomplete record that appellant has presented establishes that a "two-step interrogation technique was used [in this case] in a calculated way to undermine the *Miranda* warning." *See* Maj. op. at 10.

The court of appeals' majority opinion decided that Justice Souter's four-judge plurality opinion in *Seibert*[4] contains the Court's holding because, even though Justice Kennedy's one-judge opinion concurred in the judgment on "narrower" grounds, the "underlying rationales of Justice Kennedy's concurrence and [Justice Souter's] plurality opinion are so divergent that they render *Marks's* narrowest-grounds-interpretation rule inapplicable." *See Martinez*, 204 S.W.3d 914, 918-21 (Tex.App.–Corpus Christi 2006).[5] The court of appeals' majority opinion, however, decided that

---

[2] 542 U.S. 600, 618-22 (2004) (Kennedy, J., concurring in the judgment).

[3] *See* Maj. op. at 8 (finding Justice Kennedy's reasoning persuasive).

[4] *See Seibert*, 542 U.S. at 604-18 (Souter, J., joined by Stevens, Ginsburg, and Breyer, JJ.).

[5] If this were so, Justice Souter's plurality opinion in *Seibert* could not contain a majority

appellant loses under Justice Souter's plurality opinion. *See id.* The court of appeals' dissenting opinion would have decided that Justice Kennedy's "narrower" one-judge concurring opinion in *Seibert* contains the Court's holding under *Marks's* narrowest-grounds approach and that appellant should win under this holding. *See Martinez*, 204 S.W.3d 924-28 (Yanez, J., dissenting).[6] I would decide that it is unnecessary to determine whether Justice Souter's or Justice Kennedy's plurality opinions in *Seibert* control the disposition of this case because appellant has not carried his burden to present a sufficient record showing that he wins under either one of these opinions. *See Word v. State*, 206 S.W.3d 646, 651-52 (Tex.Cr.App. 2006) (appellate courts should not presume error from a silent record and it is the appealing party's burden to present a record showing properly preserved, reversible error); *Rowell v. State*, 66 S.W.3d 279, 280-81 (Tex.Cr.App. 2001).

Appellant was convicted of capital murder (murder committed during a robbery) and sentenced to life in prison.[7] The evidence from appellant's trial shows that three people were shot during a robbery committed by appellant and another person, both of whom used firearms. One of the robbery victims died from his gunshot wounds. The other two independently identified appellant

---

holding and would have little, if any, binding effect in this case. Under these circumstances, the Supreme Court's majority opinion in *Oregon v. Elstad* would arguably control the disposition of this case, and appellant would lose. *See Oregon v. Elstad*, 470 U.S. 298, 318 (1985) ("a suspect who has once responded to unwarned yet noncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings"); *see also Seibert*, 542 U.S. at 612 n.4 (suggesting that the defendant would have lost under *Elstad*); *but see Seibert*, 542 U.S. at 622-29 (O'Connor, J., dissenting, joined by Rehnquist, C.J., and Scalia and Thomas, JJ.) (suggesting that defendant might have won under *Elstad*).

[6]

The court of appeals' dissenting opinion, therefore, would have decided that appellant wins under a "narrower" holding than the one that the court of appeals' majority opinion decided that appellant loses under.

[7]

The state did not seek the death penalty.

as one of the robbers from a photospread approximately two months after the incident.[8]  They also identified appellant at trial as one of the robbers.  The police questioned appellant on the day of his arrest, and appellant voluntarily made the videotaped custodial statement at issue in this case in response to police questioning after receiving and waiving his *Miranda* rights.  This statement was admitted into evidence at appellant's trial.  Appellant claimed in this statement that he was in a nearby car acting as a lookout while others robbed the victims.[9]  The state claimed at appellant's trial that appellant's statement was unworthy of belief, but that even this self-serving statement was sufficient to establish appellant's guilt.[10]

---

[8]

During closing jury arguments, the state claimed that it was significant that both victims independently identified appellant as one of the robbers (apparently comparing the chances of this to winning the lottery):

> [STATE]: Mr. Camilo couldn't look at him or point at him.  They scared the hell out of him.  But what's their motive?  And, furthermore, let me ask you this, gee, because I want in on this.  What are the odds that those two little Mexican men are going to pick the same defendant, the same man that had the shotgun pointed at them that night who also owns a shotgun, who also has a skinny friend that meets the description that was given by the name of James Ruiz and that also the defendant himself puts himself there?  What are the odds?  Boy, if that was a lottery ticket, we would all be rich and never have to work again.  Wouldn't that be nice?

[9]

Appellant's statement was the only evidence presented at appellant's trial that did not place appellant at the scene of the robbery where the victims were shot.  All of the other evidence shows that appellant was at the scene of the robbery.  Though the greater weight of the evidence presented at appellant's trial establishes that appellant was one of two armed robbers at the scene of the robbery, this evidence also raised a legitimate question of whether appellant actually fired his weapon.  Our review of the trial record indicates that whether appellant actually fired his weapon, and not whether he was at the scene of the robbery, was probably the most legitimately disputed factual issue at appellant's trial.

[10]

For example, the state argued during closing jury arguments at appellant's trial:

> [STATE]: If you believe this defendant's statement, you take everything he says as

Appellant claimed on direct appeal that the trial court erroneously denied a motion to suppress this statement. Addressing the merits of this claim under the United States Supreme Court's fractured decision in *Seibert*, the court of appeals decided that *Seibert* did not require suppression of appellant's statement. We exercised our discretionary authority to review this decision.[11]

In *Seibert*, a police officer consciously decided to interrogate the in-custody defendant without providing *Miranda* warnings and obtained a confession. *See Seibert*, 542 U.S. at 604-06. After about a twenty-minute break, this same police officer provided the defendant with *Miranda* warnings and obtained basically the same confession after more interrogation during which the interrogating officer also confronted the defendant with some of her prior unwarned statements. *See*

---

true, says it here twice on this tape: I was a lookout. I was sitting in the car, looking around, knowing these guys were going to get a lick. You're a lookout and you're guilty of capital murder.

\* \* \*

Now [appellant's lawyer], would have you and she went on about, you know, this confession and all this suggestiveness and et cetera, et cetera, et cetera, as though the officers put these words in her client's mouth. Well, you know what? I watched that tape and you've got it in evidence and I counted at least seven times where the defendant in that particular tape says he's either a lookout or he's watching out. I don't believe that. I think that statement is totally self-serving and I think you probably all do, too. You're intelligent.

\* \* \*

Well, you know what? If you want to believe that statement, you go right ahead, but even–if you believe that statement, I don't, but if you do and it's up to you, you are the judges of the evidence before you. You believe it, fine. But if you believe what he says in that statement, he's guilty of capital murder.

[11]

The ground upon which we granted review states:

Whether the Court of Appeals misapplied the standards of *Seibert* in determining that a proper and functional *Miranda* warning was given Appellant here and finding Appellant's custodial statement admissible.

*id.* A Missouri trial court suppressed the initial unwarned confession, but admitted the later warned one. *See id.* The Missouri Supreme Court decided, in what appears to be a type of "fruit of the poisonous tree" analysis, that "[i]n the circumstances here, where the interrogation was nearly continuous, . . . the second [warned] statement, clearly the product of the invalid first statement, should have been suppressed."[12] In its fragmented decision, a Supreme Court majority rejected a "fruits" analysis but ultimately agreed with the Missouri Supreme Court that the second warned confession should have been suppressed. *See Seibert*, 542 U.S. at 604-18 (Souter, J., joined by Stevens, Ginsburg and Breyer, JJ.) and at 618-22 (Kennedy, J., concurring in the judgment).

Justice Souter's plurality opinion in *Seibert* decided that this confession should have been suppressed, because by "any objective measure . . . it is likely that if the interrogators employ the technique of withholding warnings until after the interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content" and would "likely mislead and deprive a defendant of knowledge essential to his ability to understand the nature of his rights."[13] Justice Souter's plurality opinion also described the facts in that case, which bear very little resemblance to the facts in the record that

---

[12]

*See State v. Seibert*, 93 S.W.3d 700, 701 (Mo. 2002), *aff'd*, 542 U.S. at 617; *but see Seibert*, 542 U.S. at 612 n.4.

[13]

Justice Souter's plurality opinion sets out "a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *See Seibert*, 542 U.S. at 615; *see also Martinez*, 204 S.W.3d at 917, 921 (applying these factors to uphold admissibility of appellant's voluntary custodial statement).

appellant has presented in this case:

> At the opposite extreme are the facts here, which by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings. (Footnote omitted). The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise her that her prior statement could not be used. (Footnote omitted). Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way Officer Hanrahan set the scene by saying "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" (Citation to record omitted). The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk. (Footnote omitted).

*See Seibert*, 542 U.S. at 616-17.

Justice Kennedy's concurring opinion asserted that Justice Souter's plurality opinion "cuts too broadly" by applying "an objective inquiry from the perspective of the suspect" to "both intentional and unintentional two-stage interrogations." *See Seibert*, 542 U.S. at 621-22 (Kennedy, J., concurring in the judgment). Justice Kennedy stated that he "would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *See id.* Apparently agreeing with the rest of Justice Souter's plurality opinion, Justice Kennedy further stated that, where

a "deliberate two-step strategy" is used, the postwarning statements "that are related to the substance of prewarning statements" must be excluded unless curative measures are taken before the postwarning statement is made. *See id*. These curative measures "should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *See id*. "For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *See id*.

In this case, appellant filed a motion to suppress his statement about a month before his trial began. His motion to suppress alleged, in relevant part, that:

> The written statements, admissions or confessions, if any were made, do not reflect that the proper admonitions were given, in violation of **Article 38.22, Section 2** of the **Texas Code of Criminal Procedure**; the **Fifth, Sixth** and **Fourteenth Amendments** to the **United States Constitution; and Article I, Section 10** of the **Texas Constitution.**

(Emphasis in original).

The only witness to testify at the suppression hearing was Officer Macario Sosa. He testified that he arrested appellant for this offense and took him to a police station, where they arrived at about 10:30 a.m. Appellant denied any involvement in the offense when Sosa and another officer asked appellant if he wanted to discuss it. Sosa testified that he had not "read [appellant] his [*Miranda*] rights at that time."[14]

---

[14]
The majority opinion asserts that the police "questioned appellant about the crime at the police station without giving the required [*Miranda*] warnings." *See* Maj. op. at 10. The record that appellant has presented reflects that, when Sosa initially brought appellant to the police station, appellant denied any involvement in the offense when Sosa and another officer asked appellant if

Apparently not satisfied with appellant's answer denying any involvement in the offense, Sosa then arranged for appellant to take a polygraph examination. These arrangements took about an hour during which time appellant was not questioned by the police.[15] Although Sosa did not specifically inform appellant that "he didn't have to take the polygraph or talk to anybody about this offense," he did ask him if he was willing to do so.[16] An "unknown polygrapher" conducted the polygraph examination, which lasted about three or four hours until about 4:30 p.m. Sosa was not present during the polygraph examination. Sosa testified at the suppression hearing that he did not

---

he wanted to discuss it. The police asking appellant if he wanted to discuss it is not "interrogation" for *Miranda* purposes. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("interrogation" is any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response); *Moran v. State*, 213 S.W.3d 917, 922-23 (Tex.Cr.App.), *cert. denied*, 128 S.Ct. 235 (2007) (police officer's comment to in-custody defendant that the police had spoken to other witnesses just after defendant had invoked his right to counsel when police asked defendant if he wanted to discuss the offense was not "interrogation" thus not requiring exclusion of defendant's subsequent incriminating statement). The police were, therefore, not required to provide *Miranda* warnings before asking appellant if he wanted to discuss it. Even if it could be said that the police "questioned appellant about the crime" for *Miranda* purposes when they initially brought him to the police station, appellant's denial of any involvement in the offense after the police asked him if he wanted to discuss it was nothing like the twenty or thirty minute, unwarned interrogation in *Seibert* that produced the defendant's incriminating statement, which she repeated about twenty minutes later during the same interrogation. *See Seibert*, 542 U.S. at 604-05.

[15]

Sosa testified that the polygrapher reviews the entire case file in order to decide which questions to ask during the polygraph examination.

[16]

The record appears to reflect that appellant agreed to take the polygraph examination after Sosa asked him if he was willing to do so.

> Q. [DEFENSE]: Like I said, up until that time, you had never given him any indication that he didn't have to take the polygraph or talk to anybody about this offense?
>
> A. [SOSA]: I had basically asked him if he was willing to take a polygraph in regards to this incident.

know whether the polygraph examiner informed appellant of his *Miranda* rights.

> Q. [DEFENSE]: So the polygraph examiner gives the person information as they're asking questions about the offense; is that correct?
>
> A. [SOSA]: I wasn't present so I can't tell you exactly what happened during the examination.
>
> Q. So you can't say for sure that the polygrapher did not provide him with details of the offense in order to ask him questions?
>
> A. I can't say whether he provided details and *Miranda* warnings, what have you, no, ma'am.[17]

When the polygraph examination was over, Sosa was informed by the polygraph examiner

that appellant had "failed" it.[18] The record is otherwise silent on just exactly what occurred during

---

[17]

The court of appeals (as does this Court) apparently considered this testimony to mean that appellant was not *Mirandized* before the polygraph examination. *See Martinez*, 204 S.W.3d at 921 ("The instant case presents a *Seibert* problem because [appellant] made pre-*Miranda* statements to police officers and a polygraph examiner, was then given separate *Miranda* warnings by a magistrate and the interrogating officers, and finally appeared in a videotaped interrogation that was admitted into evidence at trial."). This testimony, however, does not establish that appellant was not *Mirandized* before the polygraph examination. The record is actually silent on this critical issue under Seibert. This issue is critical under *Seibert*, because, if appellant was *Mirandized* before the polygraph examination, then he loses under any reading of *Seibert*.

[18]

The record is silent on which portions of the three to four-hour polygraph examination that appellant "failed." For all we know, appellant could have "failed" portions of the polygraph that were unrelated to this offense (e.g., appellant could have given a false name resulting in him "failing" the polygraph). Sosa also testified that it would be more accurate to say that "Deception was indicated" on certain questions, but that he did not know "the precise questions that were asked that supposedly reflected deception."

> Q. [DEFENSE]: I believe I said earlier that you told [appellant] he failed. In fact, that's not what a polygraph examiner would say to you; isn't that true? Someone doesn't fail or pass a polygraph, do they?
>
> A. [SOSA]: No, that's not a correct term.
>
> Q. So it would be more correct to say the polygraph expert or examiner would say to

the three to four-hour polygraph examination.[19]

Sosa informed appellant that he had "failed" the polygraph examination[20] and then took appellant before a magistrate, who informed appellant of his *Miranda* rights at about 4:55 p.m. Sosa then took appellant to another police station where Sosa again informed appellant of his *Miranda* rights at about 5:16 p.m. This was the first time that Sosa personally informed appellant of his *Miranda* rights. Appellant waived these rights and voluntarily provided the statement at issue in this

---

you: Deception was indicated on this question or that question?

A. They would have given a percentage or degree of deception, yes, ma'am, per question.

Q. But, again, without those records, you don't recall the precise questions that were asked that supposedly reflected deception?

A. No, ma'am.

[19]

*See Martinez*, 204 S.W.3d at 916 (noting that a "record was not created of the questions, statements, or results of the polygraph examination"); *compare Seibert*, 542 U.S. at 613 ("The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid.").

[20]

Arguably, this is the only evidence that might raise a viable issue under *Seibert*, since it is possible that appellant "would hardly think he had a genuine right to remain silent" after being told that he had "failed" a polygraph examination. One could speculate on this silent record that appellant, having initially denied any involvement in the offense when first brought to the police station, continued to deny any involvement in the offense during the polygraph examination and that, when confronted by the police with having "failed" the polygraph, he hardly thought he had a genuine right to remain silent (in part because he could have thought that the "failed" polygraph could be used against him later at trial) and, thus, after receiving his *Miranda* warnings twice, gave the somewhat incriminating statement that minimized his involvement in the offense but still placed him at the scene (the statement that the state argued at trial still established his guilt). This is another reason why it might be critical for the record to reflect whether or not appellant received *Miranda* warnings before the polygraph examination and what actually occurred during the polygraph examination.

case while being questioned by Sosa and another officer. The police stopped questioning appellant at 6:08 p.m. During this interview of appellant, the police did not refer to, or confront appellant with, any statements (incriminating or otherwise) that appellant may have made during the polygraph examination and the police did not repeat that appellant had "failed" the polygraph examination.[21]

Appellant's closing statement at the suppression hearing presented a smorgasbord of reasons for suppressing appellant's statement. None of these reasons, however, presented a claim that appellant's statement, "clearly the product of [any] invalid first statement, should have been suppressed"[22] or that appellant had not been "adequately and effectively" apprised of his *Miranda* rights before he made this statement.[23]

> [DEFENSE]: Your Honor, just preliminarily, we note the lack of an expressed waiver of rights at the beginning of the videotape basically with the detective, knowing these rights, do you want to talk? There is no express waiver of the rights; however, more importantly, we ask you to consider the day-long worth of activities that seem to be quite vague in Detective Sosa's mind, the lack of any record-keeping, the inability to explain what's been going on, what was talked about all day long, the lack, most

---

[21]

*Compare Seibert*, 542 U.S. at 616 ("When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used. [Footnote omitted]. Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, **and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way Officer Hanrahan set the scene by saying 'we've been talking for a little while about what happened on Wednesday the twelfth, haven't we ?'** [Citation omitted]. **The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given**.") (emphasis supplied).

[22]

*See Seibert*, 93 S.W.3d at 701.

[23]

*See Seibert*, 542 U.S. at 611-13.

importantly, of any reading of rights or *Miranda* warnings during all the questioning that occurred throughout the day by the polygraph examiner and then through these huge blanks of time up until the trip to the magistrate, which did not occur until almost 5:00 o'clock.

We submit those are not sufficient intervening circumstances to remove any taint. First of all, the lack of warnings before the day's questioning and then on the tape itself. We urge you to consider the coercive techniques that are used, the argumentation of [appellant's] refusal to accept his denials of guilt, the suggestion made that there is evidence that exists when it doesn't truly exist and so forth. And we also urge you to consider Detective Sosa's lack of memory concerning the events surrounding the taking of the statement also raise some question about the credibility involved with regard to what he says about what was done. We urge you to suppress the statement.[24]

In its closing statement at the suppression hearing, the state argued that appellant voluntarily made the statement after receiving, understanding and waiving his *Miranda* rights.

[STATE]: Very brief, Judge. All I would do is reoffer, of course, the videotape that you heard and take into consideration everything that Officer Sosa said in terms of [appellant] not being forced, threatened, promised, anything in any way to give the statement that he did, that his *Miranda* warnings were given properly, they were read off the blue card, State's Exhibit No. 2. Specifically after each warning, the defendant was asked whether or not he understood that right. He did. He did it again on the videotape. He was–not only purchased food and drink, allowed to go to the rest room, allowed to make phone calls, bottom line, Judge, is his statement was voluntarily made.[25]

The trial court denied appellant's motion to suppress based on findings that appellant "did freely, voluntarily and knowingly waive his rights to remain silent and give that statement." The trial court made the following ruling:

---

[24]

It is also noteworthy that appellant raised no claim or issue during the suppression hearing that Sosa informing him that he had "failed" the polygraph examination caused the subsequent giving of the *Miranda* warnings to him to be ineffective such that he "hardly [thought] he had a genuine right to remain silent."

[25]

Appellant made no claim that this failed to address whether the *Miranda* warnings that he received before making the statement "adequately and effectively" apprised him of these rights.

[THE COURT]: I am going to admit the statement. I make a specific finding I have found Officer Sosa to be a credible witness. The arrest warrant is a good arrest warrant. It appeared that [appellant] did freely, voluntarily and knowingly waive his rights to remain silent and give that statement. There was no testimony of any threats. The behavior of Officer Sosa appears to be exemplary and it is admitted.[26]

When the state offered appellant's statement into evidence at appellant's trial just two days after the suppression hearing, appellant reurged his "earlier objection" and for the first time directed the trial court's attention to "*Missouri v. Seibert*."

[STATE]: At this time I'm going to offer 1A into evidence.

[DEFENSE]: Your Honor, at this time we reurge our earlier objection and just to add to it, a reference to <u>Missouri v. Seibert</u>, S-E-I-B-E-R-T, U.S. Supreme Court case, pending, No. 02-1371.[27]

[THE COURT]: My ruling stands the same. Admitted.

Appellant's claim for suppressing his statement became even more focused and clear in his brief on direct appeal. In addition to containing a citation to the Missouri Supreme Court's decision in *Seibert*, appellant's brief on direct appeal also presented the argument that the admission into

---

[26]

Appellant made no claim that this ruling failed to address any claim that the *Miranda* warnings that appellant received before making the statement did not "adequately and effectively" apprise him of these rights.

[27]

It is, therefore, clear that appellant could have alerted the trial court to the Missouri Supreme Court's decision in *Seibert* during the suppression hearing just two days before. Appellant's trial took place between May 19, 2003, and May 23, 2003, with the motion to suppress hearing also occurring on May 19, 2003. The Missouri Supreme Court had handed down its decision in *Seibert* about six months before this on December 10, 2002. *See State v. Seibert*, 93 S.W.3d at 700. On May 19, 2003, the Supreme Court exercised its writ of certiorari jurisdiction to review the Missouri Supreme Court's decision. *See Missouri v. Seibert*, 538 U.S. 1031 (2003). The Supreme Court handed down its decision in *Seibert* on June 28, 2004, about one week after appellant filed his brief on direct appeal in the court of appeals. *See Seibert*, 542 U.S. at 600; *Martinez*, 204 S.W.3d at 924 n.19 (Yanez, J., dissenting). Appellant's brief on direct appeal also cited to the Missouri Supreme Court's decision in *Seibert*.

evidence of his statement was constitutional error, because "the unwarned and the warned questioning occurred as an uninterrupted and continuous process." Among other things, appellant argued in his brief on direct appeal:

> What occurred here was that the unwarned interrogation process, including submitting Appellant for polygraphing, was used tactically to get Appellant to make admissions before he was aware of his legal rights. That Appellant eventually received his warnings before the video recorder was turned on was too little too late after about hours [sic] of custodial interrogation.

In *Miranda*, the Supreme Court, having concluded that in-custody interrogation of a suspect by the police is "inherently compelling," decided that it was constitutionally necessary for the police to **"adequately and effectively apprise[]"** the in-custody suspect of certain rights, such as the right to remain silent, before interrogation can begin in order "to combat these [inherently compelling] pressures and to permit [the suspect] a full opportunity to exercise the [Fifth Amendment] privilege against self-incrimination (sic)." *See Miranda*, 384 U.S. at 445-58, 467 (emphasis supplied).[28] Justice Souter's plurality opinion in *Seibert* decided that the "question-first" interrogation technique of informing an in-custody suspect of his *Miranda* rights in the middle of a "coordinated and continuing interrogation" after the suspect has fully confessed does not "adequately and effectively apprise[]" this suspect of his rights. *See Seibert*, 542 U.S. at 611-14. This opinion states:

> When a confession so obtained is offered and challenged, attention must be paid to the conflicting objects of *Miranda* and question-first. *Miranda* addressed "interrogation practices . . . likely . . . to disable [an individual] from making a free and rational choice" about speaking, (citation omitted), and held that a suspect must

---

[28]

There is no Fifth Amendment right "against self-incrimination." The Fifth Amendment right at issue in *Miranda* and cases like this is a person's right not "to be **compelled** in any criminal case to be a witness against himself" (emphasis supplied). U.S. CONST. amend. V. Requiring an in-custody suspect to be informed of his *Miranda* rights before the police can question him apparently is intended to safeguard this right. *See Miranda*, 384 U.S. at 467, 478-79.

be "**adequately and effectively**" advised of the choice the Constitution guarantees, (citation omitted). The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed.

Just as "no talismanic incantation [is] required to satisfy [*Miranda's*] strictures," (citation omitted), it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance. "The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" (Citations omitted). The threshold issue when interrogators question first and warn later is thus whether it would be [objectively] reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment. (Footnote omitted).

There is no doubt about the answer that proponents of question-first give to this question about the effectiveness of warnings given only after successful interrogation, and we think their answer is correct. By any objective measure, applied to the circumstances exemplified here, it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content. After all, the reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling trouble. **Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again**. (Footnote omitted). A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail. Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights

and the consequences of abandoning them." (Citation omitted). By the same token, it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.

*Id*. (emphasis supplied).

Justice Souter's plurality opinion in *Seibert*, therefore, sets out a rule that first providing *Miranda* warnings to an in-custody suspect in the middle of a nearly continuous interrogation after the suspect has just confessed is the same as providing no *Miranda* warnings at all. If the police then obtain another warned confession during this nearly continuous interrogation process in the absence of any "curative measures," this confession must be suppressed, since this confession will be considered to have been obtained without the requisite prophylactic *Miranda* warnings.[29] *See Seibert*, 542 U.S. at 611-16. Justice Kennedy's concurring opinion apparently agrees except to require "that the two-step [or question-first] interrogation technique was used in a calculated way to undermine the *Miranda* warning." *See Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment).[30] Both of these opinions, therefore, considered it significant (almost dispositive) that the

---

[29] *See Seibert*, 542 U.S. at 608 (*Miranda* conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights); *Miranda*, 384 U.S. at 476 (giving of warnings is prerequisite to admissibility of custodial confession).

[30] The court of appeals' majority opinion in this case, therefore, may have erroneously decided that "the underlying rationales of Justice Kennedy's concurrence and the plurality opinion [of Justice Souter] are so divergent that they render *Marks's* narrowest-grounds-interpretation rule inapplicable." *See Martinez*, 204 S.W.2d at 920. It would appear that Justice Kennedy's concurring opinion might contain the holding in *Seibert* under *Marks's* narrower-grounds approach. *See also Martinez*, 204 S.W.3d at 920 n.5 (noting that the Fifth Circuit has decided in two recent unpublished decisions that Justice Kennedy's concurrence sets out the holding in *Seibert*). The defendant in *Seibert* won under Justice Souter's and Justice Kennedy's plurality opinions apparently because these opinions agreed that the question-first interrogation technique in *Seibert* was used in a calculated way to undermine and did undermine the *Miranda* warning. *See Seibert*, 542 U.S. at 616 n. 6 (Souter, J.) and at 620 (Kennedy, J.).

unwarned interrogation produced a confession that was repeated almost verbatim a very short time later (about twenty minutes) during a warned interrogation. The statement in this Court's opinion that it "is immaterial to our consideration whether incriminating statements emerged from the unwarned interrogation"[31] ignores the most significant component of *Seibert* that led the Court to conclude that the *Miranda* warnings provided to the defendant, just twenty minutes after she provided a complete confession during an unwarned interrogation, failed to "adequately and effectively" inform the defendant that she did not have to provide another confession. *See, e.g., Seibert*, 542 U.S. at 615 (some relevant facts that "bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object" are "the completeness and detail of the questions and answers in the first round of interrogation [and] the overlapping content of the two statements").

Assuming that appellant preserved a *Seibert* claim for appellate review,[32] appellant has not presented a record showing that he is entitled to relief under *Seibert*. The record does not show that the police actually used the "question-first" interrogation technique described in *Seibert*, and that,

---

[31] *See* Maj. op. at 14.

[32] Arguably, the record from the suppression hearing reflects that neither the trial court, based on its ruling at the suppression hearing, nor the state, based on its closing statements at the suppression hearing, understood appellant to be making a claim based on the principles discussed in either the United States Supreme Court's or the Missouri Supreme Court's decisions in *Seibert* (which could explain the lack of a complete record on what exactly occurred during the polygraph examination, particularly a critical issue under *Seibert* of whether appellant actually received *Miranda* warnings prior to the polygraph examination). *See Buchanan v. State*, 207 S.W.3d 772, 775 (Tex.Cr.App. 2006) ("When the objection is not specific, and the legal basis is *not* obvious, it does not serve the purpose of the contemporaneous-objection rule for an appellate court to reach the merits of a forfeitable issue that is essentially raised for the first time on appeal.") (emphasis in original).

if they did use such a tactic, they did so in a calculated way to undermine the *Miranda* warning. This record does not support a finding that appellant had just confessed during a nearly continuous and uninterrupted interrogation process when Sosa informed appellant of his *Miranda* rights and obtained the statement at issue here.[33]

The incomplete record that appellant has presented does show that, when appellant was first brought to the police station, the police did not interrogate him for purposes of *Miranda*[34] and appellant did not make any unwarned incriminating statements that the police later used during the warned interview. And, because the record is silent on exactly what occurred during the polygraph examination, it is difficult, if not impossible, to conclude that something may have transpired during this polygraph examination to cause the subsequent giving of the *Miranda* warnings to be ineffective.[35] Such a conclusion would be based on pure speculation.[36] The record that appellant

---

[33]

*Compare Jones v. State*, 119 S.W.3d 766, 775 (Tex.Cr.App. 2003) (defendant's warned statement inadmissible because "the unwarned and warned statements in this case were given during a nearly undifferentiated single event, taking place in the same room as an uninterrupted and continuous process").

[34]

And even if it could be said that the single question by the police to appellant asking him if he wanted to discuss it was interrogation for *Miranda* purposes, it is clear that this does not resemble the unwarned interrogation in *Seibert* that produced a confession.

[35]

Appellant presented no evidence at the suppression hearing (such as, for example, he was not informed of his *Miranda* rights before the polygraph examination or that he fully confessed during this examination) that would even raise an issue of whether something may have transpired at the polygraph examination or thereafter that might have caused the subsequent giving of the *Miranda* warnings to be ineffective. *Compare Seibert*, 542 U.S. at 605-06 (interrogating officer testified at suppression hearing that he "made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught; question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once'") and at 616 n.6 (noting that the "intent of the [interrogating] officer will rarely be as candidly admitted as it was here"). Under these circumstances, the state never assumed any burden to prove that the polygraph examination (or any interrogation technique that the police could have been using) caused the

has presented does not establish that someone in appellant's position "would hardly think that he had a genuine right to remain silent" when he voluntarily provided the custodial statement at issue in this case after being informed of and waiving his *Miranda* rights. *See Word*, 206 S.W.3d at (appealing party has burden to present a record showing properly preserved, reversible error).

The majority opinion permits appellant to win by presenting an incomplete record showing no reversible error with gaping holes of silence on critical issues, based on the assertion that this Court has "long held that the prosecution bears the burden of proving admissibility when a *Miranda* violation is found." *See* Maj. op. at 11 (citing *Creager v. State*, 952 S.W.2d 852, 860 (Tex.Cr.App. 1997) and *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex.Cr.App. 1995)). The cases cited in the majority opinion do not support a holding that the appealing party can present an incomplete and silent record showing no reversible error and win.[37]

The majority opinion's citation to *Creager* cites to a concurring opinion in *Creager* which sets out the unremarkable proposition that "[w]hen the State bears the burden of proof on a motion

---

subsequent giving of the *Miranda* warnings to be ineffective. *See State v. Kelly*, 204 S.W.3d 808, 819 n.22 (Tex.Cr.App. 2006) (state does not assume burden to prove voluntariness of a defendant's confession unless the defendant carries initial burden to present evidence to support finding of involuntariness) (citing *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex.Cr.App. 2006).

[36] It is significant that the videotaped interview clearly reflects that the police did not refer to, or confront appellant with, any statements (incriminating or otherwise) that appellant may have made during the polygraph examination. *See Seibert*, 542 U.S. at 604 (interrogating officer follows unwarned confession with *Miranda* warnings "and then leads the suspect to cover the same ground a second time") and at 605 (during warned interrogation, interrogating officer confronts suspect with her unwarned statements); *Martinez*, 204 S.W.3d at 921 (noting that appellant "was repeating the polygrapher's general statements regarding the crime [that three people were shot], not his own unwarned statements").

[37] Our case law is actually to the contrary. *See Word*, 206 S.W.3d at 651-52.

in which the defendant seeks to suppress a statement, which he claims was obtained in violation of *Miranda*, the State need prove waiver only by a preponderance of the evidence." *See Creager*, 952 S.W.2d at 860 n.2 (Meyers, J., concurring). *Alvarado* did not involve a claimed *Miranda* violation, and the defendant in *Alvarado*, rather than relying on an incomplete and silent record, actually testified and presented other evidence at a suppression hearing that raised the issue of the voluntariness of his confession before the state was put to its burden to prove voluntariness. *See Alvarado*, 912 S.W.2d at 210-11;[38] *see also Kelly v. State*, 204 S.W.3d at 819 n.22 (state does not assume burden to prove voluntariness of a defendant's confession unless the defendant carries initial burden to raise an issue of involuntariness of the confession).

A defendant has always been required to make some initial showing on the record in the trial court that raises a legitimate issue of whether he is entitled to relief under the specific claim that he presents (usually by making an evidentiary showing that would support the claim). *See Herrera v. State*, 241 S.W.3d 520, 526-27 (Tex.Cr.App. 2007) (mere filing of motion to suppress does not thrust burden on the state to show compliance with *Miranda* unless and until defendant proves that statements he wishes to exclude were result of custodial interrogation) and at 533-34 (Cochran, J., concurring) ("The right to *Miranda* warnings applies once the defendant establishes that the setting is one of custodial interrogation. [Footnote omitted]. Only then does the State have a 'heavy burden' to establish that *Miranda* warnings were given and that the defendant voluntarily waived those rights

---

[38] Rather than relying on a silent record, the defendant in *Alvarado* actually presented evidence that, if believed by the factfinder, would have supported a finding that the defendant's confession was involuntary placing the burden on the state to prove voluntariness. *See Alvarado*, 912 S.W.2d at 210-11.

and voluntarily responded to custodial questioning.").[39] Only then does the burden shift to the state to defeat this specific claim with its failure to do so being grounds for a successful appeal by the other party. *See id*. The Court's decision is based on the state's failure to prove something that it never had the burden to prove, because appellant never "raised" the issue.[40]

In this case, the state carried its "heavy burden" in the trial court to establish that *Miranda* warnings were given and that appellant voluntarily waived his *Miranda* rights and voluntarily responded to custodial questioning producing the videotaped statement at issue in this case. If appellant really meant to put the trial court and the other party on notice that it needed to prove that these warnings really did not "adequately and effectively" apprise him of these rights, then he should have said so instead of remaining silent. In other words, he should have "raised" this issue.

---

[39]

*See also Kelly*, 204 S.W.3d at 819 n.22 (defendant had initial burden to produce evidence to support finding that she did not consent to blood draw); *Ford v. State*, 158 S.W.3d 488, 492 (Tex.Cr.App. 2005) (defendant, claiming Fourth Amendment violation, bears initial burden of producing evidence to support finding of improper police conduct such as proving that a search occurred without a warrant shifting the burden to the state to establish the validity of the search); *Terrazas*, 4 S.W.3d at 727 (state never assumed burden to prove voluntariness of defendant's confession because defendant did not carry her initial burden of raising an issue of voluntariness).

[40]

For example, appellant's suppression motion did not raise an issue of the effectiveness of the *Miranda* warnings that appellant received. Appellant's suppression motion alleged that "proper admonitions" were not given. This is quite different from alleging that "proper admonitions" were given but that these "proper admonitions" did not "adequately and effectively" apprise appellant of his rights under *Miranda*. The allegation in appellant's suppression motion and the arguments he made at the suppression hearing certainly did not put any burden on the State to prove that these "proper admonitions" were ineffective. The state responded to the only claim presented in appellant's suppression motion when it proved at the suppression hearing that "proper admonitions" were, in fact, given.

Arguably, appellant's citation to "*Seibert*" during the middle of trial two days after the suppression hearing raised the issue of the effectiveness of the warnings. I would, however, decide that this, coming as it did just two days after the suppression hearing in the middle of trial without any further explanation of why "*Seibert*" would require a different result, still did not raise any issue as to the effectiveness of the warnings under *Seibert*.

I respectfully dissent.

Hervey, J.

Filed: December 17, 2008
Publish